MaddeN, Judge,
dissenting:
The court has decided that the plaintiffs are not entitled to be paid for all of the time spent at White Sands because, during several hours of that time, “they were actually off duty and not performing any services for the Government, but were free to go where they pleased and do what they pleased.” The quoted statement is not applicable to the plaintiffs’ situation, unless the plaintiffs had such peculiar mentalities and tastes that the only things they pleased to do were to lie under the buses in the parking lot to get out of the sun, or to go to the snack-bar to get a cup of coffee, *73 or to go to the library and read, or to go swimming in the pool.
It was, as a practical matter, impossible for them to get off the Army post during their four hours of unpaid time. There was no public transportation from the post. They of course could not have their own automobiles, because they drove to the post in the Army buses. They had to be at the Army post in order to do the Army’s work of driving the buses back to the cities where the other people who worked at the post lived. Try as one will, he cannot think of any practical and economical way in which the Army could have had these buses driven, morning and evening, and the “£B” runs made during the day, without requiring the plaintiffs to wait four hours for the evening run. The plaintiffs were, therefore, at the post in the desert for Army purposes, and pursuant to the statute, and the judicial precedents, they are entitled to be paid for their time.
If one is hired to drive a party of geologists out to a point in the desert and is told that his party will return to the vehicle in four hours, and that in the meantime he may do as he pleases, who would say that his pay did not run on during the four hours? Would the fact that there were geological treatises or comic books in his vehicle, or coffee in a thermos jug, or water in a nearby pool prove that he was not there for his employer’s purposes and benefit? Would he not have been “engaged to wait”? Skidmore v. Swift & Co., 323 U.S. 134, 137; Armour & Co. v. Wantock, 323 U.S. 126, 133; Missouri K. and T. Ry. Co. v. United States, 231 U.S. 112, 119. And would the fact that the same event occurred every working day over a period of months or years affect its legal consequences ?
OPINION OE THE COMMISSIONER
This action was instituted by the plaintiffs for the recovery of overtime compensation under the portion of section 23 of the act of March 28, 1934 (48 Stat. 509, 522), as amended (5 U.S.C., 1958 ed., 673c), which provides:
* * * That the regular hours of labor [for wage-board employees of the Government] shall not be more than forty per week; and all overtime shall be compensated for at the rate of not less than time and one half.
*74 At the request of plaintiffs’ counsel, and with the acquiescence of defendant’s counsel, the trial was limited under Buie 22 (b) to the claims of those plaintiffs who are mentioned in findings 27-35, and the proceedings with respect to all other plaintiffs were held in abeyance. In this connection, counsel for the plaintiffs conceded that if none of the plaintiffs named in findings 27-35 is entitled to recover, none of the other plaintiffs is entitled to recover.
During some part of the 6-year period immediately preceding the date (October 18, 1957) of the filing of the petition in this case, each of the plaintiffs was employed by the Department of the Army as a civilian bus driver at a military post which was known during the period in question as the White Sands Proving Ground, but which is now known as the White Sands Missile Bange. (For the sake of convenience, this military post will usually be referred to in the opinion as “White Sands.”) The plaintiffs’ compensation schedules were fixed by the Army-Air Force Wage Board.
White Sands is located in a desert region of southern New Mexico. The nearest sizable towns are Las Cruces and Alamogordo, New Mexico, and El Paso, Texas. The headquarters area at White Sands is approximately 28 miles northeast of Las Cruces, approximately 52 miles southwest of Alamogordo, and approximately 51 miles north of El Paso (over the most direct route).
The White Sands bus service was originally established in order to provide transportation 5 days per week (Monday through Friday) for civilian employees and military personnel who worked at White Sands but who lived in or near Las Cruces, Alamogordo, or El Paso. Morning bus runs from each of the three towns mentioned to White Sands, and afternoon bus runs from White Sands to the three towns, were established. A one-way bus fare of 25 cents was collected from the bus riders. A similar morning and afternoon bus service between Hatch, New Mexico, and White Sands was established later during the period involved in the present suit. The bus drivers lived in the various towns from which service to White Sands was provided under the system.
Providing the bus service required each bus driver, as a normal pattern of operation, to work each regular workday *75 for approximately 2 hours in the morning (from about 6 to 8 a.m.) in operating a bus from the town of his residence to White Sands and in performing other duties directly related to such operation, and to work for another period of approximately 2 hours in the afternoon (from about 4 to 6 p.m.) in operating a bus from White Sands to the town of his residence and in performing other duties directly related to such operation.
During the interval of approximately 8 hours between about 8 a.m. and about 4 p.m., the bus drivers from time to time were required while at White Sands to perform other work not directly involving the transportation of passengers, as follows:
(1) If a bus needed gasoline, oil, or water, the need was supplied by the driver from facilities provided for the purpose by the management. While the evidence on the point is not clear, it is inferred that a bus driver did not devote more than 1 hour per week to such work, on the average.
(2) It was usually necessary for a driver to wash his bus once or twice each week, and this required anywhere from 45 to 90 minutes of a driver’s time per week.
(3) Each driver was required to perform a rather thorough weekly check on his bus and to make a report concerning the results of the check. The bus was greased during the course of the checking operation. This weekly checking and greasing required an average of approximately 1 hour per week.
(4) If a bus needed mechanical repairs, the bus driver drove the bus a short distance to the repair shop. Thereafter, the driver was required to go to the repair shop and get the bus at 4 p.m. (or earlier if he preferred and the repairs had been completed) in order that it might be used for the afternoon run to the town of his residence. However, this type of work was infrequent and, if averaged out on a weekly basis, it required only a few minutes of a bus driver’s time per week.
(5) Another task performed by the bus drivers was the “policing” of the bus area each day in order to remove trash from the area. It appears that the drivers did not devote *76 more than 10 or 15 minutes per day, on the .average, to this type of work.
(6) If a bus tire needed fixing, it was the responsibility of the driver to remove the wheel containing the defective tire, put on a spare wheel and tire, and take the defective tire (on its wheel) to the tire repair shop. This type of work was infrequent and, if averaged out on a weekly basis, required only a negligible amount of a bus driver’s time per week.
In order to make provision for the performance of the duties outlined in the preceding numbered paragraphs, the management at White Sands, during the early part of the period involved in this litigation, designated the morning hours until 12 noon of each workday as on-duty time for the bus drivers. Hence, each driver had approximately 20 hours of on-duty time per week for the performance of duties that required 5 or 6 hours of .actual work, on the average. The time from 12 noon until 4 p.m. of each workday was considered by the management at White Sands as off-duty time for the drivers.
Sometime in 1952, because congestion at the single wash rack occasionally made it difficult for some drivers to wash their buses during the morning duty hours, an arrangement was made by the management at White Sands whereby approximately half of the bus drivers were considered as being on duty during the morning until 12 noon and off duty from 12 noon until 4 p.m., while the remainder of the drivers were considered as being off duty from 8 a.m. until 12 noon and on duty after 12 noon.
Therefore, except for certain special situations that will be discussed subsequently, each bus driver had a period of approximately 4 continuous hours each workday, either in the morning or in the afternoon, when he was regarded by the management at White Sands as being off duty. This “off-duty” time intervened between periods of duty.
The bus drivers were paid on the basis of an 8-hour day and a 40-hour week for the services that are involved in this litigation. The 8 hours of daily working time for which a driver was compensated consisted of the 2 hours in the morning involved in operating a bus from the town of the bus driver’s residence to White Sands (and related activities); *77 the 2 hours in. the afternoon involved in operating the bus from White Sands back to the town of the driver’s residence (and related activities); and another 4-hour period of duty either in the morning or in the afternoon. No compensation was received for the “off-duty” time that intervened between periods of duty.
In so far as the management at White Sands was concerned, the bus drivers were free to go where they wished and to do what they pleased during their “off-duty” time. Because of White Sands’ isolation, however, and the lack of any practicable means of leaving the post (at least during the early part of the period involved in this action), the bus drivers generally spent their “off-duty” time at White Sands, waiting for their subsequent duties to begin. During the greater part of the period involved in this suit, the drivers’ waiting time was usually spent in or near their parked buses, but in 1956 a waiting room, with facilities for recreation, was provided for the drivers by the management at White Sands. The drivers went to a cafeteria on the post and to the post exchange whenever they wished to do so; and they could have gone to the post library or to a swimming pool on the post, but it appears that none of them did.
The first question to be decided is whether the daily 4-hour periods which the management at White Sands regarded as being off-duty time for the bus drivers were actually “hours of labor,” within the meaning of that term as used in the governing statute. In this connection, it is clear at the outset that an employee need not be engaged continuously in physical or mental exertion on behalf of his employer in order to be in a working status and thus entitled to compensation. On the contrary, time spent while waiting to perform actual labor constitutes working time under some circumstances and, therefore, is compensable. However, it is characteristic of the cases so holding that they involved situations where the employee was under orders from the employer to wait at a particular place, the employes was liable to be called upon at any moment for the performance of actual labor, and he was not at liberty to go away for the purpose of engaging in other activities of his own choice. Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944); Farley v. United States, 131 *78 Ct. Cl. 776, 779 (1955); see Missouri, K. & T. Ry. Co. v. United States, 231 U.S. 112, 119 (1913). In other words, waiting time is working time only if the employee has been “engaged to wait.” Skidmore v. Swift & Co., 323 U.S. 134, 137 (1944). It necessarily follows that in a situation where an employee has complete freedom during a waiting period to go where he pleases and do what he pleases, so long as he is at the proper place when the time arrives for the beginning of his actual labor, the waiting time is not working time, and is not compensable. Abbott v. United States, 138 Ct. Cl. 459, 464 (1957).
Upon applying the principles discussed above to the facts of the present case, the conclusion seems inescapable that the daily 4-hour waiting periods at White Sands which were regarded by the management as off-duty time did not constitute “hours of labor” and, therefore, are not compensable under the governing statute. As previously stated, the employees were free to go where they pleased and to do what they pleased during these waiting periods. Their election generally to remain at White Sands during the 4-hour waiting periods was not predominantly for the benefit of the Government, but, instead, was due to the isolation of the post in a desert area and the inconvenience of going elsewhere. See Armour & Co. v. Wantock, supra, at p. 133.
With respect to the point discussed above, it should be mentioned that during the 6 years involved in this litigation there were some occasions when a bus driver spending an off-duty period at White Sands would be asked by a supervisor to help “police” the bus area, or to drive a bus to the repair shop, or to go to the repair shop and get a bus that had been repaired, or to perform some other chore requiring a few minutes of the bus driver’s time. However, such instances were infrequent and the amount of working time involved in them was inconsequential. Therefore, such instances may properly be disregarded in the present litigation. Armstrong v. United States, 144 Ct. Cl. 659, 665, cert. denied, 361 U.S. 825.
The plaintiffs contend that, in any event, the daily 4 hours of so-called “off-duty” time must be considered as “hours of labor” during the period between November 1954 and March *79 1957 because of the promulgation of a pertinent regulation by the Department of the Army.
On September 1, 1954, section 210 (b) of the act of that date (68 Stat. 1105, 1112) amended section 604(a) of the Federal Employees Pay Act of 1945 (59 Stat. 295, 303) by adding a paragraph which provided in part as follows:
(2) Except where the head of each * * * department, establishment, or agency * * * determines that his organization would be seriously handicapped in carrying out its functions or that costs would be substantially increased, he shall provide, with respect to all officers and employees in his organization, * * * that breaks in working hours of more than one hour shall not be scheduled in any basic workday. [5 U.S.C., 1958 ed., 944(a)(2).]
Although (with certain exceptions not pertinent here) the Federal Employees Pay Act of 1945 is declared by section 102 of the act (5 U.S.C., 1958 ed., 902(c)) to be inapplicable to wage-board employees, the Department of the Army on November 3,1954 revised its Civilian Personnel Regulations so as to provide (among other things) that, both with respect to employees holding positions subject to the Classification Act and wage-board employees:
Daily tours of duty will not be broken by off duty periods of more than one hour.
It was further provided in the amended regulations that:
* * * Exception * * * will be made only in those cases where commanding officers of installations determine that their application would seriously handicap the performance of a function or where substantially increased costs would result. ,
Notwithstanding the promulgation by the Department of the Army in November 1954 of the amended regulations referred to in the preceding paragraph, the management at White Sands thereafter continued to operate the bus service on a split-shift basis, as previously discussed, with the bus drivers having a 4-hour period of “off-duty” time each workday between tours of duty. However, until March 28, 1957, there was no formal written finding by the commanding officer of the post that the application to bus drivers at White *80 Sands of the departmental regulation declaring that “Daily tours of duty will not be broken by off duty periods of more than one hour” would seriously handicap the bus service or result in substantially increased costs. The plaintiffs argue that an exception to this departmental regulation could be based only upon a formal written finding of the sort just mentioned and, accordingly, that no exception in the case of the bus drivers at White Sands was permissible during the period between November 3, 1954 and March 28,1957.
It was not necessary for the Department of the Army to provide, with respect to wage-board employees such as the bus drivers at White Sands, that “Daily tours of duty will not be broken by off duty periods of more than one hour.” However, when the Department by regulation did extend to wage-board employees the benefit of such a provision, the regulation thereupon became binding on, and could not properly be ignored by, the civilian and military officials of the Department, so long as the regulation remained in effect. Service v. Dulles, 354 U.S. 363, 388 (1957); Vitarelli v. Seaton, 359 U.S. 535, 539-540 (1959); Watson v. United States, 142 Ct. Cl. 749, 756 (1958). In this connection, though, it will be noted that the regulation, in providing for the making of exceptions to the general rule, did not prescribe any particular form for the essential finding. It merely stated that exceptions could be made in those instances where commanding officers of installations determined that the application of the general rule would seriously handicap the performance of a function or result in substantially increased costs.
In the present case, although the commanding officer at White Sands did not make any formal written determination of the sort contemplated by the “exception” provision of the regulation until March 28,1957, the purport of the pertinent evidence warrants an inference that the commanding officer continued to operate the bus service on a split-shift basis during the period between November 3, 1954 and March 28, 1957 because of his conclusion that to operate the service on a straight-shift basis would, in fact, seriously handicap the performance of the bus-service function or result in substantially increased costs, or both, Therefore, it appears that *81 there actually was no violation in this case after November 3,1964 of the departmental regulation establishing the general rule with respect to wage-board employees (including the bus drivers at White Sands) that “Daily tours of duty will not be broken by off duty periods of more than one hour,” but authorizing exceptions in appropriate cases.
Furthermore, even if it were to be concluded that the commander at White Sands violated the departmental regulation between November 3, 1954 and March 28, 1957 by operating the bus service on a split-shift basis, this would not help the plaintiffs’ cause. The commander, of course, would have been answerable for the violation to his superiors in the departmental hierarchy. The violation would not, however, have entitled the bus drivers to additional compensation by converting into “hours of labor” time during which they were actually off duty and not performing any services for the Government, but were free to go where they pleased and do what they pleased.
We turn now to the consideration of a special situation that affected some bus drivers during certain weeks in the years 1952-1954. Sometime in 1952, the management at White Sands began to establish a free type of bus transportation known as “Class B” service. (The morning and afternoon transportation for pay between certain residential towns and White Sands, previously discussed in this opinion, was known as “Class A” service.) On a Class B run, free transportation was provided over a specified route and on the basis of a fixed schedule for military personnel or civilian employees, or both, needing such service in connection with the performance of their official duties. A typical Class B run was between two or more specified points within the exterior limits of the post and involved four round trips per day, each round trip requiring approximately 1 hour for completion. The first round trip would be made between approximately 8 and 9 o’clock in the morning; the second, between approximately 10:30 and 11:30 in the morning; the third, between approximately 12 noon and 1 o’clock in the afternoon; and the fourth, between approximately 3 and 4 o’clock in the afternoon.
*82 Class B runs were customarily assigned on a weekly basis to bus drivers who also had morning and afternoon Class A assignments to operate buses between the civilian communities previously mentioned and White Sands. During the years 1952-1954, when such a Class B run was assigned to a driver for a particular week, he was expected to make the four scheduled daily trips, as well as make his morning and afternoon Class A trips and perform at least some other duties during the week, such as obtaining gasoline, oil, and water, and performing the weekly checking and greasing operation. A driver operating four daily Class B trips of the sort mentioned in this paragraph during a particular week was customarily excused from washing his bus and from “policing” the bus area during that week. Any time during the workday at White Sands when such a driver was not driving his Class B run or performing other duties of the sort previously mentioned, he was considered by the management at White Sands as being in an off-duty status. One of these periods was the half-hour period at about the noon hour, and this was available and customarily used for the eating of lunch.
On a workday during a week when a particular bus driver was assigned to operate four daily Class B trips of the sort discussed in the preceding paragraph, as well as to operate the usual morning and afternoon Class A trips between the civilian community of his residence and White Sands, he ordinarily did not devote more than 8 hours out of the total period between about 6 a.m. and 6 p.m. to the performance of actual work for the Government. However, the periods of waiting time that intervened between periods of actual work were not long enough to permit the driver to leave the post for the purpose of engaging effectively in activities of his own choice, and this would have been so even if White Sands had not been located in an isolated desert region. Consequently, the so-called “off-duty” time was necessarily spent in readiness to perform the next tour of duty (except for the usual luncheon period around the middle of the day). For this reason, it is my opinion that these periods of waiting time (except the usual luncheon period) represented time spent predominantly for the Government’s benefit, and that *83 they should be regarded as “hours of labor.” See Travis v. Ray, 41 F. Supp. 6, 8 (W.D. Ky., 1941).
The conclusion stated in the preceding paragraph is pertinent only with respect to the particular weeks during which particular bus drivers were assigned to perform four daily Class B trips of the sort previously mentioned, as well as to operate the usual morning and afternoon Class A trips. At all times, the number of civilian bus drivers at White Sands exceeded the number of Class B runs; and each week during 1952-1954 there were some bus drivers with Class A assignments who were not assigned to Class B runs. These drivers either were on duty for the performance of miscellaneous duties from 8 a.m. until 12 noon and off duty from 12 noon until 4 p.m., or were off duty from 8 a.m. until 12 noon and on duty for the performance of miscellaneous duties in the afternoon. Such a driver’s off-duty time should not be regarded as constituting “hours of labor,” for the reasons given in an earlier portion of this opinion.
Sometime in 1954, the management at White Sands adopted a plan whereby each Class B run of the sort previously mentioned was divided between two drivers. One. driver would take the two morning trips, and the other driver would take the two afternoon trips. The driver with the morning Class B assignment was on duty until 12 noon and off duty from 12 noon until 4 p.m., while the driver with the afternoon Class B assignment was off duty from 8 a.m. until 12 noon and on duty after 12 noon. For the remainder of the period involved in the present litigation, each driver with an on-post Class B assignment during a particular week, as well as a Class A assignment, had a period of 4 continuous hours sometime between his morning and afternoon Class A trips that constituted off-duty time. For the reasons previously stated, such off-duty time did not constitute “hours of labor,” in my opinion.
A second special situation which perhaps should be commented upon relates to the establishment, sometime in 1952, of a mixed Class B and Class A daytime bus run between White Sands and Las Cruces. It was a Class B run in that free transportation was provided for guards working at White Sands, and it was a Class A run in that other civilian *84 or military personnel in an off-duty status could ride the bus by paying the customary 25-cent fare. This run was rotated on a weekly basis among the Las Cruces bus drivers with morning and afternoon Class A assignments. On this run, the driver left White Sands at 8 a.m. (after having completed his morning Class A trip from Las Cruces to White Sands) and arrived in Las Cruces at about 9 a.m. From the time of his arrival in Las Cruces until 2:30 p.m., the driver was free to go and do what he pleased, and he was regarded by the management at White Sands as being off duty. At 2:30 p.m., the driver began the return trip to White Sands, and he arrived there at about 3:30 pm.[1] The period between Ms midafternoon arrival at White Sands and his departure from White Sands to make his afternoon Class A trip back to Las Cruces was on-duty time.
The only point that needs to be discussed in connection with the situation outlined in the preceding paragraph is whether the bus driver’s time in Las Cruces from about 9 a.m. until about 2:30 p.m. was actually off-duty time, as believed by the White Sands management, or constituted “hours of labor.” It seems clear to me that since the bus driver was in his home town during tMs period, and was free to spend the time at his home (or elsewhere, if he preferred) and to do whatever suited his fancy, the period in question was properly regarded by the White Sands management as off-duty time. Hence, it did not constitute “hours of labor” for which the bus driver was entitled to receive compensation.
Another special situation requiring discussion arose out of the establishment of a mixed Class B and Class A daytime bus run between WMte Sands and El Paso sometime during the first half of 1956. The driver to whom tMs run was assigned for a particular week would, after having made his morning Class A run to White Sands, leave White Sands at 9 o’clock in the morning for El Paso. Since the most direct route from White Sands to El Paso through the desert was *85 normally closed to traffic at that time, the trip over a longer route would usually take about 2 hours. The driver would customarily get back to White Sands at about 1 p.m. The driver, while holding this assignment, was regarded by the management as being off duty from 8 a.m. until 9 a.m., and off duty again from the time of his return to White Sands from El Paso at about 1 p.m. until 4 p.m.
Applying the principles outlined in earlier portions of this opinion to the situation described in the preceding paragraph, it seems to me that the 1-hour period between 8 a.m. and 9 a.m. .actually constituted waiting time spent predominantly for the benefit of the Government and, therefore, was within the category of “hours of labor.” On the other hand, it appears that the 3-hour period in the afternoon, between the time of the bus driver’s return to White Sands from El Paso at about 1 p.m. and the beginning at 4 p.m. of his actual work in preparing for his afternoon Class A trip, was sufficiently long to constitute an off-duty period rather than a waiting period predominantly spent for the benefit of the Government.
When the facts pertaining to the individual plaintiffs (see findings 27-35) are considered in relation to the legal principles discussed in this opinion, it appears that the plaintiffs Jose Y. Baca and J. E. Jones are severally entitled to additional compensation for the daily periods between 8 a.m. and 9 a.m. on those days during 1956-1957 when these respective drivers operated the daytime mixed Class B and Class A bus run between White Sands and El Paso, as well as a morning and afternoon Class A bus run; and that the plaintiffs Floyd I). Campbell, Bodolpho Martinez, and James M. Simpson are severally entitled to additional compensation for 3]/2 hours per day on those days during 1952-1954 when these respective drivers operated on-post Class B bus runs for two morning and two afternoon trips per day, in addition to operating morning and afternoon Class A bus trips. It further appears that the plaintiffs Verney B. Bunch, Cecil B. Gillespie, and Werttie L. Haney are not entitled to recover, and that the petition should be dismissed as to them.
The facts relating to the plaintiff Yick Y. Serna are somewhat different from those relating to any other plaintiff *86 whose cause was presented at the trial. The plaintiff Serna, after having had a period of previous employment as a bus driver at White Sands, resumed such employment on October 13,1952. He was assigned to operate a Class A bus run between Alamogordo and White Sands. In December of 1952, he and another bus driver, in addition to performing their duties as operators of Class A bus runs, were assigned to assist the bus master. It was contemplated by the management at White Sands that one of these men would assist the bus master from 8 a.m. until 12 noon, and then would be off duty from 12 noon until 4 p.m.; and it was contemplated that the other man would be off duty from 8 a.m. until 12 noon, and would then assist the bus Piaster from 12 noon until 4 p.m. The assistance consisted of preparing and issuing trip tickets to other drivers, typing duty rosters, answering the telephone, and relaying the bus master’s instructions to other drivers. The plaintiff Serna, after becoming an assistant to the bus master, continued to operate the morning and afternoon Class A bus trips between Alamogordo and White Sands, but he was not required to perform other duties of the sort customarily performed by bus drivers during their on-duty time at White Sands (such as “policing” the bus area, operating Class B bus runs, etc.) .[2]
Although not required to do so, the plaintiff Serna, with the knowledge and acquiescence of the bus master, frequently rendered assistance (of the sort previously mentioned) to the bus master during his “off-duty” time at White Sands. Hence, it is clear that the plaintiff Serna actually performed services for more than 40 hours per week during many of the weeks that are involved in the present litigation. However, the evidence also makes it plain that it was mutually understood by the plaintiff Serna and the White Sands management, at the time when the plaintiff Serna was assisting the bus master during his “off-duty” time, that he would not be compensated for such services. Therefore, the work that he did during his “off-duty” time must be regarded as constituting voluntary services, for which he cannot afterwards *87 properly claim compensation. Goode v. United States, 25 Ct. Cl. 261, 267 (1890). It necessarily follows that the petition should be dismissed as to the plaintiff Serna.
FINDINGS OE FACT

General

1. At the request of plaintiffs’ counsel, and with the acquiescence of defendant’s counsel, the trial was limited under Buie 22(b) to the claims of those plaintiffs who are mentioned in findings 27-35; and the proceedings with respect to all other plaintiffs were held in abeyance. In this connection, counsel for the plaintiffs conceded that if none of the plaintiffs mentioned in findings 27-35 is entitled to recover, none of the other plaintiffs is entitled to recover.
2. During some part of the 6-year period immediately preceding the date (October 18,1957) of the filing of the petition in this case, each of the plaintiffs was employed by the Department of the Army as a civilian bus driver at a military post which was known during the period in question as the. White Sands Proving Ground, but which is now known as the White Sands Missile Bange. (For the sake of convenience, this military post will usually be referred to in the findings as “White Sands.”) The plaintiffs were civil service employees. Their compensation schedules were fixed by the Army-Air Force Wage Board; and, except for those plaintiffs who were designated as “leaders,” the plaintiffs’ positions were classified as Wage Board Grade 11.
3. At all pertinent times, it was the intention of the management at White Sands that, as a general rule, the civilian bus drivers should operate on the basis of a split shift, with daily periods of duty being separated by one or more periods of off-duty time. This plan of operation was known to all concerned, although there was no written official pronouncement to that effect by the commander at White Sands earlier than March 2'8, 1957 (see finding 48).
4. White Sands is located in a desert region of southern New Mexico. The nearest sizable towns are Las Cruces and Alamogordo, New Mexico, and El Paso, Texas. The headquarters area at White Sands is approximately 28 miles northeast of Las Cruces, approximately 52 miles southwest *88 of Alamogordo, and approximately 51 miles north of El Paso (over the most direct route).
5. The civilian bus drivers were assigned to the Bus Section, which was one of the five sections comprising the Motor Transport Branch of the Transportation Division at White Sands. The head of the Bus Section was an Army sergeant, who was known as the bus master. The Motor Transport Branch was headed by a commissioned officer of the Army, as was the Transportation Division. The chief of the Transportation Division was responsible to the commander of the post, but reported to the commander through the Logistics Office (G-4) of the headquarters staff.
6. (a) The Bus Section at White Sands was originally organized in order to provide transportation services 5 days per week (Monday through Friday) for civilian employees and military personnel who worked at White Sands but who lived in or near Las Cruces, Alamogordo, or El Paso. Morning bus runs from each of the three towns mentioned to White Sands, and afternoon bus runs from White Sands to the three towns, were established to operate each regular workday. A one-way bus fare of 25 cents was collected from the bus riders. These bus runs were known as “Class A” runs.
(b) At the beginning of the period involved in this litigation, there were approximately 5 morning and afternoon Class A bus runs between El Paso and White Sands, approximately 14 morning and afternoon Class A bus runs between Las Cruces and White Sands, and 1 morning and afternoon Class A bus run between Alamogordo and White Sands. The number of Class A runs was gradually increased, so that, by the end of the period involved in the present litigation, there were at least 14 morning and afternoon Class A bus runs between El Paso and White Sands and at least 24 morning and afternoon Class A bus runs between Las Cruces and White Sands, as well as the morning and afternoon Class A bus run between Alamogordo and White Sands. Also, a morning and afternoon Class A bus run between Hatch, New Mexico, and White Sands, a distance of approximately 62 miles, had been added.
(c) All the Class A bus runs mentioned in this finding were operated by civilian bus drivers.
*89 7. (a) The buses for the Class A runs between Las Cruces and White Sands were kept at night in a parking lot in Las Cruces. Similarly, most of the buses for the Class A runs between El Paso and White Sands were kept at night in a parking lot in El Paso. The bus for the Class A run between Alamogordo and White Sands, the bus for the Class A run between Hatch and White Sands, and some of the buses for Class A runs between El Paso and White Sands were parked at night at the homes of the respective drivers of the buses.
(b) In the morning, when a driver reached his bus at the parking place, it was ordinarily necessary for him to spend from 5 to 10 minutes checking on the operating condition of the bus and warming the engine. As the El Paso drivers were required to depart from their parking places at 6 a.m., they usually had to be at the parking places somewhere between 5:50 and 5:55 a.m. in order to perform the necessary checking and engine warm-up. The Las Cruces drivers, on the other hand, had a shorter distance to travel in going to White Sands (although the traffic was very heavy), and they could arrive at their parking lot at or shortly after 6 a.m. and still perform the necessary checking and engine warm-up before beginning their actual driving operations. Since the buses used on the Alamogordo and Hatch routes were parked at the homes of the respective drivers at night, it is inferred that they could make their respective morning schedules by beginning their checking and engine warm-up operations at 6 a.m.
(c) After leaving the bus parking place in the morning, the operator of a Class A bus run proceeded to one or more designated bus stops in his town for the purpose of picking up his passengers; and, when the passengers were aboard, he drove to White Sands. The customary time of arrival in White Sands was somewhere between 7:30 and 7:45 a.m.
8. After reaching White Sands in the morning and discharging his passengers at a designated place, a bus driver swept out his bus, entered the necessary information concerning the morning trip on the trip ticket for that day, and delivered the trip ticket for the previous day to the bus master’s office. These duties required approximately 15 minutes of the driver’s time.
*90 9. From time to time, as indicated below, bus drivers were required while at White Sands to perform other work not directly involving the transportation of passengers:
(a) If a bus needed gasoline, oil, or water, the need was supplied by the driver from facilities provided by the management for that purpose. While the evidence on the point is not entirely clear, it is inferred that a bus driver did not devote more than 1 hour per week to such work, on the average. Ordinarily, gasoline was needed on alternate days.
(b) Ordinarily, it was necessary for the bus drivers to wash their buses once or twice each week. The washing operations required from approximately 45 to approximately 90 minutes of a bus driver’s time per week.
(c) Each driver was required to perform a rather thorough weekly check on his bus and to make a report concerning the results of the check. The bus was greased during the course of the checking operation. The whole process required an average of approximately 1 hour per week.
(d) If a bus needed mechanical repairs, the bus driver drove the bus a short distance to the repair shop. Thereafter, the driver was required to go to the repair shop and get the bus at 4 p.m. (or earlier if he preferred and the repairs had been completed) in order that it might be used for his afternoon Class A run. The evidence warrants an inference that this type of work was infrequent and, if averaged out on a weekly basis, required an average of only a few minutes of a bus driver’s time per week.
(e) The bus drivers were required to “police” the bus area each day (i.e., pick up empty soft-drink bottles, cigarette butts, and other forms of trash). It appears that the drivers did not devote more than 10 or 15 minutes per day, on the average, to this type of work.
(f) If a bus tire needed fixing, it was the responsibility of the driver to remove the wheel containing the defective tire, put on a spare wheel and tire, and take the defective tire (on its wheel) to the tire repair shop. The evidence warrants an inference that this type of work was infrequent and, if averaged out on a weekly basis, required only a negligible amount of a bus driver’s time per week.
*91 10. In order to prepare for the afternoon Class A bus runs from White Sands, the bus drivers were required to go to their buses at 4 p.m. They checked on the operating condition of the buses and, if the buses were not already at the place designated for the loading of passengers (e.g., if a bus was at the repair shop after having been worked on during the course of the day), the drivers drove the buses to the loading place. The bus drivers were required to be with their buses at the designated loading place not later than 4:15 p.m. The passengers boarded the buses between 4:15 and 4:30, and the buses departed from White Sands at 4:30. Those bound for El Paso, Alamogordo, or Hatch reached their destinations in about iy2 hours, while the Las Cruces buses reached their destination in approximately 1 hour. Each bus driver had to spend a few additional minutes in parking and finally checking the bus, and in entering the necessary information concerning the afternoon trip on the trip ticket for the particular day.
11. (a) From the beginning of the period involved in this litigation until sometime in 1952, the time between the bus drivers’ arrival at White Sands, after completing their morning Class A runs, and 12 noon each day was considered by the management at White Sands as on-duty time for all drivers. During the course of a workweek (Monday through Friday), the drivers were expected to utilize this on-duty time at White Sands, to the extent that it was needed, for the performance of the duties mentioned hi findings 8 and 9.
(b) During the 1951-1952 period mentioned in paragraph (a) of this finding, the time from 12 noon until 4 p.m. each workday was considered by the management at White Sands as off-duty time for the bus drivers; and, in so far as the management was concerned, the bus drivers were free to go where they wished and to do what they pleased during their “off-duty” time. Because of White Sands’ isolation, however, and the lack of any practicable means of leaving the post, the bus drivers spent their “off-duty” time at White Sands, waiting for their afternoon duties to begin at 4 p.m. This time was generally spent in or near the parked buses, although the drivers went to a cafeteria on the post and to the post exchange whenever they wished to do so. The drivers *92 could have gone to the post library or to a swimming pool on the post, but it appears that none of them did.
12. Sometime in 1952, because congestion at the single wash rack occasionally made it difficult for some drivers to wash their buses during morning duty hours, an arrangement was made by the management at White Sands whereby approximately half of the bus drivers were considered by the management as being on-duty until 12 noon and off-duty from 12 noon until 4 p.m., while the remainder of the drivers were considered as being off duty from 8 a.m. (following the completion of the duties referred to in finding 8) until 12 noon, and on duty after 12 noon. Drivers were expected to utilize their on-duty time from 8 a.m. until 12 noon, or from 12 noon until 4 p.m., as the case might be, for the performance of any necessary duties, such as those mentioned in finding 9. Except as indicated in finding 14(b), it continued to be impracticable for bus drivers to leave White Sands during their “off-duty” time, irrespective of whether it was in the morning or in the afternoon.
13. (a) Sometime in 1952 — and after the development referred to in finding 12 — the management at White Sands began to establish a free type of bus transportation known as “Class B” service. On a Class B bus run, free transportation was provided over a specified route and on the basis of a fixed schedule for military personnel or civilian employees, or both, needing such service in conection with the performance of their official duties.
(b) Class B runs were customarily assigned on a weekly basis to bus drivers who also had morning and afternoon Class A assignments.
(c) A typical Class B bus run was between two or more specified points within the exterior limits of the post and involved four round trips per day, each round trip requiring approximately 1 hour for completion. The first round trip would be made between approximately 8 and 9 o’clock in the morning; the second, between approximately 10:30 and 11:30 in the morning; the third, between 12 noon and approximately 1 o’clock in the afternoon; and the fourth, between approximately 3 and 4 o’clock in the afternoon. During the period 1952-1954, when such a run was assigned to a driver for a *93 particular week, he was expected to make the four scheduled daily trips, as well as make his morning and afternoon Class A trips and perform at least some duties of the sort mentioned in finding 9 (e.g., procuring gasoline, oil, and water when needed, and performing the weekly checking and greasing operation) between the trips on the Class B run. He was customarily excused from washing his bus and from policing the bus area during a week when operating four daily Class B trips of the sort mentioned in this finding. Any time during the workday at White Sands when such a driver was not driving on his Class B run or performing duties of the sort mentioned in finding 9, he was considered by the management at White Sands as being in an off-duty status. The half-hour free period at about the noon hour was available, and was customarily used by such a driver, for the eating of lunch.
(d) The number of civilian bus drivers at White Sands exceeded the number of Class B runs; and those drivers not assigned to Class B runs during a particular week in the period 1952-1954 were considered by the management at White Sands as being on duty until 12 noon and off duty from 12 noon until 4 p.m., or as being off duty from 8 a.m. until 12 noon and on duty after 12 noon, in accordance with the plans mentioned in findings 11 and 12. Except as indicated in finding 14(b), it continued to be impracticable for bus drivers to leave White Sands during their “off-duty” time, irrespective of whether such “off-duty” time for a driver on a particular day comprised a 4-hour morning or afternoon period or several short periods between trips on a Class B run.
14. (a) Sometime in 1952, a mixed Class B and Class A daytime bus run between White Sands and Las Cruces was established. It was a Class B run in that free transportation was provided for guards working at White Sands, and it was a Class A run in that other civilian or military personnel in an off-duty status could ride the bus by paying the customary 25-cent fare. This run was rotated on a weekly basis among the Las Cruces bus drivers with morning and afternoon Class A assignments. On this run, the driver left White Sands at 8 a.m. (after having completed his morning Class A trip from Las Cruces to White Sands) and arrived *94 in Las Cruces at about 9 a.m. From the time of his arrival in Las Cruces until 2:30 p.m., the driver was free to go and to do what he pleased, and he was regarded by the management at White Sands as being off duty. At 2:30 p.m., the driver began the return trip to White Sands, and he arrived there at about 3:30 p.m. The period between his midafter-noon arrival at White Sands and his departure from White Sands to make his afternoon Class A trip back to Las Cruces was on-duty time.
(b) After the establishment of the mixed Class B and Class A run mentioned in paragraph (a) of this finding, a bus driver who was considered by the management to be off duty in the morning could, if he wished to do so, ride this bus to Las Cruces. Off-duty drivers occasionally went to Las Cruces in this fashion, but it was necessary for such a driver to take annual leave for the period from 12 noon (when his next on-duty period was scheduled to begin) until his actual return to duty at White Sands. Permission had to be obtained in advance from a competent superior for the taking of annual leave, but there apparently was no difficulty in obtaining such permission.
15. (a) There was also a combination Class B and Class A nighttime bus run between White Sands and Las Cruces. The operator of this run did not have a Class A assignment. The first trip on this run was a round trip from White Sands to Las Cruces, and return. It began at about 6 p.m. and ended at about 8 p.m. On the next trip, the driver left White Sands at about 8:15 p.m. and arrived in Las Cruces approximately 1 hour later. He remained in Las Cruces for about an hour, during which time the driver, who customarily lived in Las Cruces, usually went to his home and ate an evening meal. Thereafter, the driver left Las Cruces at about 10:15 p.m. and drove to White Sands, arriving there approximately 1 hour later. The next trip left White Sands at 12:30 a.m. and reached Las Cruces about 1 hour later. The driver was then scheduled, to make a final trip from Las Cruces to White Sands, beginning at 1:40 in the morning, if there were passengers in Las Cruces who wished to make the trip and who could not be accommodated in a station wagon which was operated by a military driver and which left Las Cruces for *95 White Sands at about 1:40 a.m. In most instances, the station wagon was able to provide transportation for all who wished to go from Las Cruces to White Sands at 1:40 a.m., so that the bus driver was free to take the bus to the parking lot shortly after 1:40 a.m. and then go off duty. If, however, it was necessary for the bus driver to make the 1:40 a.m. trip from Las Cruces to White Sands, he ordinarily reached White Sands approximately 1 hour after leaving Las Cruces; and his daily tour of duty then ended at White Sands, in so far as the White Sands management was concerned..
(b) As indicated in paragraph (a) of this finding, the driver of this night run between White Sands and Las Cruces customarily lived in Las Cruces. During the greater part of the period involved in this litigation, the driver was “on his own” in getting from Las Cruces to White Sands prior to beginning his evening driving duties at White Sands, and in returning from White Sands to Las Cruces on the infrequent occasions when the driver ended his oflicial driving duties at White Sands rather than at Las Cruces. Sometime during the period 1955-1957, however, an arrangement was made whereby, as a convenience for the driver of this nighttime bus run between White Sands and. Las Cruces, he could pick up an empty bus at Las Cruces in the late afternoon, use it for his own transportation from Las Cruces to White Sands, then use it for the various official trips during the night, and finally use it for his own transportation from White Sands back to Las Cruces in the early morning, if it was necessary for him to make the 1:40 a.m. official trip from Las Cruces to White Sands.
16. Sometime in 1954, the management at White Sands adopted a plan whereby each Class B run of the sort mentioned in finding 13(c) was divided between two drivers. One driver would take the two morning trips, and the other driver would take the two afternoon trips. The driver with the morning Class B assignment during a particular week was regarded by the management as being on duty until 12 noon and off duty from 12 noon until 4 p.m., while the driver with the afternoon Class B assignment was regarded by the management as being off duty from 8 a.m. until 12 noon and on duty after 12 noon. For the remainder of the period in *96 volved in tlie present litigation, each bus driver with an on-post Class B assignment during a particular week, as well as a Class A assignment, bad a period of 4 continuous hours sometime between Ms morning and afternoon Class A trips that was regarded by the management as an off-duty period.
17. In the fall of 1955, a daytime Class B bus run between White Sands and the Holloman Air Force Base was established. The driver to whom this run was assigned for a particular week would, after maMng his regular Class A morning run to White Sands, leave White Sands at 8 a.m. and reach Holloman sometime between 9:15 and 9:30. Thereafter, he would leave Holloman for the return trip at about 10:15 or 10:30 and reach White Sands approximately 1% or iy2 hours later. The time spent at Holloman by such a driver could be utilized for the purpose of servicing his bus. While assigned to the Holloman Class B run, a bus driver was regarded by the management at White Sands as being off duty from 12 noon until 4 p.m.
18. (a) Sometime during the first half of 1956, a mixed Class B and Class A daytime bus run between White Sands and El Paso was established. The driver to whom this run was assigned for a particular week would, after having made his morning Class A trip to White Sands, leave White Sands at 9 o’clock in the morning for El Paso. Since the most direct route from White Sands to El Paso through the desert was normally closed to traffic at that time, the trip over a longer route would usually take about 2 hours. The driver would customarily get back to White Sands at about 1 p.m. The driver, while holding this assignment, was regarded by the management as being off duty from 8 a.m. until 9 a.m. and from the time of his return to White Sands from El Paso at about 1 p.m. until 4 p.m.
(b) After the establishment of the bus run mentioned in paragraph (a) of this finding, a bus driver with a 4-hour “off-duty” period in the morning could have ridden this bus to and from El Paso, if he had wished to do so. However, he would have had only about 15 minutes in El Paso, and it would have been necessary for him to take annual leave from 12 noon until the arrival of the bus back at White Sands. It *97 is not clear to what extent, if any, off-duty drivers took advantage of this opportunity.
19. About 1956, the management at White Sands provided a waiting room, equipped with such facilities as tables, chairs, and a soft-drink vending machine, to be used by the bus drivers during their “off-duty” time.
20. When a driver with a Class A assignment was assigned to a Class B run for a particular week, he continued to make the usual morning and afternoon trips on his Class A run during the week.
21. Each week after the establishment of Class B runs at White Sands, there were some bus drivers with Class A assignments who did not have any Class B assignments. Such drivers were regarded by the management as being on duty until 12 noon each workday and off duty from 12 noon until 4 p.m., or as being off duty from 8 a.m. until 12 noon and on duty after 12 noon.
22. At all pertinent times involved in this litigation, bus drivers were at liberty, in so far as the management at White Sands was concerned, to go where they pleased and to do what they pleased during their “off-duty” time. However, a bus driver who found himself at White Sands with a period of “off-duty” time intervening between his morning and afternoon Class A trips was unable, as a practical matter, to leave White Sands, except as indicated in findings 14(b) and 18(b).
23. After the management at White Sands adopted the type of schedule for bus drivers which contemplated that each weekday some of the drivers with Class A assignments would bo on duty throughout the morning and off duty from 12 noon to 4 p.m., and that the remainder of such drivers would be off duty from 8 a.m. to 12 noon and on duty after 12 noon, the bus master would sometimes, on short notice, switch a driver’s on-duty and “off-duty” periods for a particular day in order to meet some transportation need that unexpectedly arose. Such occurrences were infrequent.
24. During the 6-year period involved in this litigation, there were some occasions when a bus driver spending an “off-duty” period at White Sands would be asked by the bus master to help “police” the bus area, or to drive a bus to the *98 repair shop, or to go to the repair shop and get a bus that had been repaired, or to perform some other chore requiring a few minutes of the bus driver’s time. However, the evidence does not show either the specific or approximate dates when services of this sort were performed by bus drivers during “off-duty” periods. Furthermore, it appears that such instances were infrequent and that the amount of work involved in them was inconsequential.
25. The plaintiffs were compensated by the Department of the Army on the basis of an 8-hour day and a 40-hour week, without any extra pay for overtime, in connection with the plaintiffs’ activities that are involved in the present litigation.
26. Prior to the filing of this suit on October 18,1957, the plaintiffs did not at any time submit to the Department of the Army any claim for overtime compensation with respect to the plaintiffs’ activities that are involved in this litigation.

Individual Plaintiffs

27. The plaintiff Jose V. Baca worked as a bus driver at White Sands from February 1, 1955 until September 26, 1957. During that period, he operated a Class A bus run between El Paso and White Sands. Also, from time to time, he had on-post Class B runs, the Class B run between White Sands and Holloman Air Force Base, and the daytime mixed Class B and Class A run between White Sands and El Paso.
28. The plaintiff Verney R. Bunch became a bus driver at White Sands in June of 1952. At first, he operated Class B runs on an 8-hour-day basis. He did not have a Class A run at that time. Later, he was assigned to the mixed Class B and Class A nighttime bus run between White Sands and Las Cruces. While the evidence on the point is not clear, the inference is warranted that the plaintiff Bunch, by December 1955, had been assigned to a Class A bus run between Las Cruces and White Sands; and, presumably, he was thereafter assigned Class B runs on a weekly basis from time to time, in addition to performing his duties as the operator of a Class A run.
29. The plaintiff Floyd D. Campbell became a bus driver at White Sands on September 1, 1953. At all pertinent *99 times thereafter, he operated a Class A bus run between El Paso and White Sands. During the first month of his employment, he also operated an on-post Class B shuttle bus run for 4 continuous hours during the morning of each working day. Then, for a period of about 3 months, he operated an on-post Class B run of the sort mentioned in finding 13(c), making two morning and two afternoon trips. Beginning in 1954, he was from time to time assigned on a weekly basis to morning or afternoon duty as the operator of various Class B bus runs. The Class B assignments were in addition to his regular Class A assignment.
30. The plaintiff Cecil E. Gillespie was employed as a bus driver at White Sands on January 15, 1956. For approximately 1 month, he did not have a bus run, but spent an 8-hour working day on other duties in the bus area at White Sands. From February 1956 until April or May of 1956, he was assigned to the mixed Class B and Class A nighttime bus run between White Sands and Las Cruces. Then, for a period of 10 or 11 months, he worked an 8-hour day at White Sands as an extra driver, not assigned to a regular run. In March of 1957, he was assigned to a Class A bus run between El Paso and White Sands. Presumably, he was thereafter given at least an occasional weekly assignment to morning or afternoon duty as the operator of a Class B bus run, in addition to performing his work on the Class A run.
31. The plaintiff Werttie L. Haney, after having had a period of previous employment as a bus driver at White Sands, resumed such employment on August 27,1953. From that date until sometime around the middle of 1955, he was assigned to the mixed Class B and Class A nighttime bus run between White Sands and Las Cruces. For a part of this period, however, he operated the nighttime bus run only 3 days per week, and spent the other 2 days of the week operating a daytime bus run on an 8-hour-day basis. About the middle of 1955, he was assigned to a Class A bus run between El Paso and White Sands. Thereafter, in addition to performing his duties as the operator of a Class A bus run, he was given weekly assignments from time to time to operate Class B bus runs in the morning or in the afternoon.
*100 32. The plaintiff J. E. Jones went to work at White Sands as a bus driver on July 31,1955. He was assigned to a Class A bus run between El Paso and White Sands. After working for 6 or 8 months, he was assigned on a weekly basis to morning or afternoon Class B bus runs from time to time, in addition to performing his duties as the operator of a Class A run. Among the Class B runs that he had was the daytime mixed Class B and Class A bus run between White Sands and El Paso.
33. The plaintiff Rodolpho Martinez went to work at White Sands as a bus driver in August of 1953 and worked until January of 1957. He was assigned to a Class A bus run between El Paso and White Sands. From time to time, in addition to his work as the operator of a Class A bus run, he received weekly assignments to on-post Class B bus runs. Some of these Class B runs during 1953-1954 required the making of two morning and two afternoon trips, as indicated in finding 13(c). He also at times had the Class B run between White Sands and the Holloman Air Force Base.
34. The plaintiff Vick V. Serna, after having had a period of previous employment as a bus driver at White Sands, resumed such employment on October 13, 1952. He was assigned to operate a Class A bus run between Alamogordo and White Sands. In December of 1952, he and another bus driver, in addition to performing their duties as operators of Class A bus runs, were informally assigned to assist the bus master. It was contemplated by the management at White Sands that one of these men would assist the bus master from 8 a.m. until 12 noon, and would then be off duty from 12 noon until 4 p.m.; and it was contemplated that the other man would be off duty from 8 a.m. until 12 noon, and would then assist the bus master from 12 noon until 4 p.m. The assistance consisted of preparing and issuing trip tickets to other drivers, typing duty rosters, answering the telephone, and relaying the bus master’s instructions to other drivers. The plaintiff Serna, after becoming an assistant to the bus master, continued to operate the morning and afternoon Class A bus trips between Alamogordo and White Sands, but he was not required to operate Class B bus runs or to perform other duties of the sort referred to in finding 9. The plaintiff *101 Serna was formally designated as a “section leader” in February 1956. His duties in that position were approximately the same as they had formerly been in his role as an. assistant to the bus master. Although not required to do so, the plaintiff Serna, with the knowledge and acquiescence of the bus master, frequently rendered assistance to the bus master of the sort previously mentioned during his “off-duty” time. The management at White Sands and the plaintiff Serna mutually understood, at the time when such services were performed during his “off-duty” periods, that he would not be compensated for those services.
35. The plaintiff James M. Simpson started to work at White Sands as a bus driver on September 2,1952. He was assigned to a Class A bus run between Las Cruces and White Sands. From time to time, in addition to performing his duties as the operator of a Class A bus run, he was given weekly assignments to operate Class B bus rmis. During the period 1952-1954, several of these Class B bus runs thus assigned to him required the making of two morning and two afternoon trips per day, as indicated in finding 13(c).

Department of the Army Regulations

36. At the beginning of the period of time involved in the present litigation, and until March 25, 1952, the Civilian Personnel Regulations of the Department of the Army relating to the subject of hours of work provided in part as follows:
Section 1
General Provisions
SCOPE
1-1. These regulations are applicable to all employees of the Department within the United States, regardless of the legal basis for computing their pay. * * *
COVERAGE
1-2. This regulation is concerned with administrative authority to establish or change hours of duty of Department of the Army employees.
* * * * *
*102 DEFINITIONS
1-4. a. Administrative workweek. — The days and number of hours of work per week which employees are regularly required to perform; when used with reference to full-time officers and employees subject to the Civil Service Commission’s overtime pay regulations, the administrative workweek established pursuant to section 301(b) of those regulations. (The requirements of section 301 (b) are described in par. 2-10.)
b. Basic workweek. — The period within an administrative workweek for which an employee is regularly paid at straight-time rates; when used with reference to full-time officers and employees subject to the Civil Service Commission’s overtime pay regulations, the forty-hour workweek established pursuant to section 301(a) of those regulations. (The requirements of section 301(a) are described in par. 2-9.)
c. Regularly scheduled administrative workweek. — The portion of each week which is fixed in advance as the period during which an employee is regularly required to be on duty; when used with reference to full-time officers and employees subject to the Civil Service Commission’s overtime pay regulations, the administrative workweek established pursuant to section 301(b) of those regulations. (The requirements of section 301(b) are described on [sic] in par. 2-10.)
d. Irregular or occasional overtime. — A period during which an employee actually works but which is not included within his regularly scheduled administrative workweek; when used with reference to officers and employees subject to the Civil Service Commission’s overtime pay regulations, hours of employment in excess of the regularly scheduled administrative workweek.
e. Regularly scheduled tour of duty. — The hours and days, fixed in advance, during which an employee is regularly required to be on duty; when used with reference to full-time officers and employees subject to the Civil Service Commission’s overtime pay regulations, the administrative workweek established pursuant to section 301(b) of those regulations. (The requirements of section 301(b) are described in par. 2-10.)
Jji íjí iji ijC
*103 Section 2
Establishment of Workweeks
ESTABLISHMENT OP BASIC AND ADMINISTRATIVE WORKWEEKS
* * * * *
2-2. Length of basic workweek. — The basic workweek for employees in the several trades and occupations whose compensation is set by wage boards or other wage fixing authorities is fixed at not more than 40 hours by section 23 of the act of March 28,1934 (5 U.S.C. 673c), as extended by section 203 of the Federal Employees Pay Act of 1945 (Public Law 106, 79th Cong.). All additional hours of officially ordered or approved duty within the administrative workweek are to be treated as overtime.
*****
POLICY
2-4. The Department’s policy concerning the establishment of hours of work is given in Orders “B”, 16 December 1947, subject, Hours of Work. The order is quoted—
1. The Federal Employees Pay Act of 1945 requires the establishment of a basic work week of 40 hours, with the hours of work to cover a period of not more than 6 of any 7 consecutive days. After passage of this Act, the President in a memorandum to the Heads of the Departments and Agencies dated August 23, 1945, requested that there be established wherever practicable a normal forty-hour work schedule of five days, eight hours per day. Pursuant to this policy a basic forty-hour work week will be maintained in the Department of the Army, with the forty hours of regularly scheduled work confined, insofar as possible, to the period of Monday through Friday, inclusive.
2. Where ofemting conditions make such action absolutely necessary the forty-hour tour may be scheduled over fewer than five days or over not more than six days in a period of seven consecutive days. Authority to so schedule work weeks is hereby delegated to the Chief of Staff, the Commanding General, Army Ground Forces, the commanding generals of armies (ZI) and Military District of Washington, the chiefs of administrative and technical services, and the commanding generals of the *104 oversea commands or their designated representatives, for redelegation to the lowest practicable echelon.
3. Wherever required by essential operations, additional overtime hours may be scheduled on either a regular or intermittent basis. Authority for requiring such overtime work is hereby delegated to the officers listed in paragraph 2 above or their designated representatives for redelegation to the lowest practicable echelon. Controls over overtime work may be established for field installations by appropriate command headquarters and for the departmental service by the Office, Secretary of the Army. Prior to establishment of any overtime tour on a regularly scheduled basis consideration should be given to use of skeleton staffs.
4. The tours of duty of employees, such as firefighters, required to remain at or within the confines of their posts of duty for more than forty hours per week but which do not require that all of their time be devoted to actual work will be established in accordance with applicable regulations.
*****
The authority to fix or change the basic 40-hour tour of duty (the five 8-hour days in the administrative workweek) is the responsibility of the commanding officer of the installation. It is to be noted that the 40-hour basic tour must be scheduled for each administrative workweek in order that the employee may be considered as a full time employee for leave accrual purposes.
* * * Sic
2-6. Employee coverage. — The overtime pay regulations promulgated by the Civil Service Commission under the Federal Employees Pay Act of 1945, and approved by the President in Executive Order 9578 of June 30,1945, apply to all civilian officers and employees in or under the executive branch of the United States Government, including Government-owned and controlled corporations, except those listed below:
* * * * * .
d. Employees whose basic compensation is fixed and adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose;
*****
2-7. Workweeks to foe established. — Heads of agencies must establish for all full-time empoyees subject to the Commission’s overtime pay regulations:
*105 a. A regularly scheduled basic workweek of-40 hours;
b. A regularly scheduled administrative workweek, consisting of the 40-hour basic workweek plus such period of overtime as will regularly be required of each group of employees.
2-8. Method of establishing workweeks. — The basic and administrative workweeks must be established by general public regulation.
2-9. Identification of basic workweek. — a. The regulation establishing the basic workweek must specify the names of the calendar days, and the number of hours of employment for each of these days, which are included in the basic workweek. However, the Comptroller General has ruled that it will be regarded as sufficient if the head of the agency, by administrative order, prescribes the general pattern for the basic workweek for the guidance of field officers. These officers would then follow this general pattern in prescribing daily tours of duty as the needs of the service may require (25 Comp. Gen. 151, August 7, 1945). (This was accomplished by Orders “B”, 16 December 1947. See paragraph 2-4.)
b. Whenever it is impracticable to prescribe a regular schedule of definite hours of duty for each workday of a regularly scheduled workweek, the first 40 hours of duty performed within a period of not more than 6 days of the administrative workweek may be established as the basic workweek; and all additional hours of officially ordered or approved duty within the administrative workweek should be treated as overtime (25 Comp. Gen. 14, July 5,1945).
c. The basic workweek may not extend over more than six of any seven consecutive days. In a memorandum to the heads of departments and agencies on June 30, 1945, the President indicated his desire that whenever Eracticable, the basic workweek be spread out over the rst five days of the administrative workweek — whenever possible, on Monday through Friday.
2-10. Identification of administrative workweek.— a. The regulation establishing the regularly scheduled administrative workweek must identify, by names of calendar days and by number of hours per day, the periods of time included in the regularly scheduled administrative workweek which are in addition to the basic workweek.
b. Unlike the basic workweek, the administrative workweek is not limited to six of any seven consecutive days (25 Comp. Gen. 121, July 28,1945). The President has indicated, in a memorandum to the heads of depart *106 ments and agencies on June 80, 1945, Ms desire that any hours in excess of 40, in a regularly scheduled administrative workweek, be scheduled for the sixth day of that week — whenever possible, for Saturday.
c. The head of the agency may wish to prescribe specific hours in the regulation, or to state the agency’s policy toward night work. For work between 6 p.m. and 6 a.m., night differential is payable under the conditions described in CPE P-13, “Night Differentials.”
*
2-12. Tours containing regularly scheduled overtime are allowed, but will be kept to an absolute minimum.
(1) Before approving an overtime schedule, every effort should be made to eliminate the necessity for such overtime through assignment of personnel from activities in which the work load has decreased, recruitment of additional personnel within prescribed personnel authorizations, or through rescheduling of hours of work.
(2) Actual operating needs will be the basis for overtime tours.
(3) Overtime tours should be approved for as short a period as possible and renewed only if absolutely necessary.
(4) Skeleton staffs will be used wherever possible in lieu of complete staffs. (A “skeleton staff” may include as many as half of the personnel in a given activity.)
(5) Occasional overtime may be authorized in accord-. anee with section 5.
(6) Where 6 or 7 days coverage is required, it is suggested that the nonwork days be staggered.
í]: íj! í¡í í{!
2-17. So far as the Department of the Army is concerned, the term “on-call employees” will be restricted to firefighters who are assigned to an on-call tour, as described in the following paragraph. If any installation has an employee(s) (other than firefighters) who is believed to be on call, or for whom an on-call tour is believed justified, that installation should submit a complete report of the proposed tour through channels to the Civilian Personnel Division, Office of the Secretary of the Army. The report should contain information concerning the classification, grade, and salary of the employee, the duties and responsibilities, the tour desired, and an explanation of why an on-call tour is considered desirable and necessary. Wherever possible, these “problem situations” should be resolved on a normal *107 basis, rather than on an on-call basis. The Civilian Personnel Division, Office of the Secretary of the Army, will retain sole authority for approving these exceptions.
Section 3
Establishment of Honrs for Opening and Closing Offices
^ $ $ $ $
NOTICE EOR WORKING HOURS
3-2. Honrs of duty for individual employees should be scheduled in advance and as much notice as possible should be given concerning the working hours. Arbitrary changes in starting time and frequent fluctuations from day work to night work should be avoided. Where changes from day shifts to night shifts are necessary, it is generally desirable that employees remain on one shift a minimum of 2 weeks — 4 weeks is even more desirable.
SPECIAL CONSIDERATIONS IN FIXING TOURS OP DUTY H* H* ❖ Hi ❖
b. The fixing of hours of work for Federal employees, subject to the requirements of applicable laws and regulations, is the responsibility of the administrative office. The jurisdiction of the Comptroller General with respect thereto extends only to a determination that expenditures for salary or wages are authorized under the law (17 Comp. Gen. 3, July 3,1937: 21 Comp. Gen. 965, April 30,1942).
* * if if if
Section 5
Night Shifts and Irregular or Occasional Overtime or Holiday Work
* * * * *
REQUIRING OCCASIONAL OVERTIME OR HOLIDAY WORK

Overtime

_ 5-3. Authority to require overtime. — Heads of agencies may delegate to any officer or employee authority to order or approve overtime in excess of the administrative workweek, by employees subject to the Commission’s overtime pay regulations. No overtime in excess of the administrative workweek shall be ordered or ap *108 proved except in writing by an officer or employee to whom such authority has been specifically delegated by the head of the agency. This authority was delegated by the Secretary of the Army in paragraph 2, Orders “B”, 16 December 1947. See paragraph 2-4 of this regulation.
* $¡ * * *
WORK IN EXCESS OE 8 HOURS PER DAT DURING EXTRAORDINARY emergency: how compensated
5-12. Work performed by laborers and mechanics in excess of 8 hours per day during an extraordinary emergency will be compensated for at overtime rates only if it is also in excess of 40 hours worked or hi a leave with pay status in the unit week.
GRANTING COMPENSATORY TIME OPE # * *!: ❖ *
b. Compensatory time off in lieu of paid overtime may be granted to all employees, graded or ungraded, paid on a per annum basis, except those whose ger annum rates are fixed by the War Department Wage ¡oordination Board, or by other wage fixing authorities setting wages as a result of a wage survey. It should be particularly noted that per-hour employees whose rates are set on an hourly, daily, or piecework basis, are not eligible for compensatory time off.
* * $ ❖ *
OFFICIAL TIME REPORTS
5-14. All overtime work in excess of the regularly scheduled tour of duty (including regularly scheduled overtime, if any) must be ordered or approved by an officer or employee to whom authority has been specifically delegated. * * * Commands may establish such controls over extra overtime work as they consider necessary, including the requirement for a separate approval in writing. Where such controls are not established, the official time report will be sufficient to prove that all time thereon was officially ordered or approved, provided it is signed or initialed by an individual to whom there has been delegated the authority to order or approve extra overtime. Irregular or occasional time worked in excess of 40 hours in the unit week must be certified on the official time report.
37. As of March 25, 1952, the Civilian Personnel Kegula-tions of the Department of the Army relating to the subject *109 of hours of work were revised so as to read in part as follows:
Section 1
General Provisions
SCOPE AND COVERAGE
$ $ 3$ $
b. These regulations provide the requirements for fixing tours of duty for all employees of the Army Establishment, wherever located, regardless of their tenure of employment and legal basis for computing their pay. * * *
* * * # *
RESPONSIBILITIES

Delegation of Authority

1-3. a. Section 12, act 2 August 1946 (5 U.S.C. 22a) permits the delegation of authority to take final action on the employment, direction, and general administration of personnel, including the authority to fix the hours of work for employees, subject to applicable laws and regulations prescribed by the Department of the Army. The requirements imposed by the statutes cited in paragraph 1-2, as well as the policy of the Department of the Army with respect to hours of work for its civilian employees, are set forth in DA Orders B, 16 December 1947, the pertinent portion of which is quoted below. Paragraph 2, DA Orders B, delegates authority to the armies, commands, and services for redelegation to the lowest practicable echelon. The responsibility for establishing and changing the hours of work for employees of the Army Establishment, subject to the requirements of applicable laws and the provisions of these regulations, is therefore the responsibility of each commanding officer employing civilian personnel. The pertinent portion of DA Orders B is as follows:
1. The Federal Employees Pay Act of 1945 requires the establishment of a basic workweek of 40 hours, with the hours of work to cover a period of not more than six of any seven consecutive days. After passage of this Act, the President in a memorandum to the Heads of the Departments and Agencies, dated August 23,1945, requested that there be established wherever practicable a normal 40-hour work schedule of 5 days, 8 hours per day. Pursuant to this policy a basic 40-hour workweek will be maintained in the Department of the Army, *110 with the 40-hours of regularly scheduled work confined, so far as possible, to the period of Monday through Friday, inclusive.
2. Where operating conditions make such action absolutely necessary the 40 hour tour may be scheduled oyer fewer than 5 days or over not more than 6 days in a period of seven consecutive days. Authority to so schedule workweeks is hereby delegated to the Chief of Staff, the commanding generals of armies (ZI), and Military District of Washington, the chiefs of administrative and technical services, and the commanding generals of the oversea commands or their designated representatives, for redelegation to the lowest practicable echelon.
3. Whenever required by essential operations, additional overtime hours may be scheduled on either a regular or intermittent basis. Authority for requiring such overtime work is hereby delegated to the officers listed in paragraph 2 or their designated, representatives for redelegation to the lowest practicable echelon. Controls over overtime work may be established for field installations by appropriate command headquarters and for the departmental service by the Office, Secretary of the Army. Prior to establishment of any overtime tour on a regularly scheduled basis consideration should be given to use of skeleton staffs.
4. The tours of duty of employees, such as fire fighters, required to remain at or within the confines of their posts of duty for more than 40 hours per week but which do not require that all of their time be devoted to actual work, will be established in accordance with applicable regulations.

OonvptroTler General

b. The jurisdiction of the Comptroller General with respect to hours of work extends only to a determination that expenditures for salary or wages are authorized under the law. 17 Comp. Gen. 3; 21 id 965.
DEFINITION S

Administrative Workweek

1-4. a. An administrative workweek is a period of seven consecutive calendar days, used as a unit in computing pay. Generally, the administrative workweek is identical to the calendar week, beginning at 0001 hours on Sunday and ending at 2400 hours the following Saturday. The administrative workweek consists of the regularly scheduled tour of cluty, as defined below, and *111 the regular day (s) off. In the case of on-call employees (sec. 3), the administrative workweek normally will be established to begin and end on the hour of a day when shifts change. In such cases, except for purposes of computing holiday pay, the calendar day also will be considered as beginning and ending at the time the 24-hour shifts change.

Tour of Duty

b. Tour of duty refers to the hours of the day, and the days within an administrative workweek, fixed in advance, during which the employee is required to perform service on a regular, repetitive basis. As used in these regulations, an employee’s tour of duty consists of his basic tour of duty and any overtime work that is scheduled to be performed on a regular, repetitive basis.

Basic Tour of Duty

c. The basic tour of duty is the 40-hour workweek, established pursuant to the statutes cited in paragraph 1-2. Service during the basic tour of duty is compensated for at straight time rates as prescribed in CPU Pll. Generally, the basic tour of duty will consist of five 8-hour days, Monday through Friday of each administrative workweek. For on-call employees, the basic tour of duty consists of 60 basic hours; generally, two 24-hour periods and one 12-hour period during each administrative workweek.

Irregular Tow of Duty

d. An irregular tour of duty is a basic tour of duty established as the first 40 hours of service within an administrative workweek. Such tours are reserved to those work situations where it is impossible to schedule specific days and/or hours of duty in advance, although it is known that at least 40 hours of service normally will be required within each administrative workweek. Such situations will arise primarily in connection with inspection activities where need for an inspector’s services is conditioned by factors beyond the Department’s control (such as weather conditions or a contractor’s production schedule).

On-Call Tour of Duty

e. A basic tour of duty involving regularly scheduled stand-by time is defined as an on-call tour of duty; *112 that is, where the employee is not required to devote all his time in actually performing service, but nevertheless is required to remain at or within the confines of his post of duty to perform service when called or when the need arises. See section 3 for definition of other compensable stand-by time.

Part Time Tour of Duty

f.A part time tour of duty is a scheduled tour of less than 40 hours which requires service on a regular repetitive basis on one or more days of each administrative workweek.

Regularly Scheduled Overtime

g. Regularly scheduled overtime refers to the periods in the administrative workweek, in excess of the basic tour of duty, during which the employee is required to perform service on a regular, repetitive basis.

Irregular or Occasional Overtime

h. Irregular or occasional overtime is authorized service performed at infrequent intervals which is in excess of the hours established for the regularly scheduled tour of duty as defined above.
* * * * *
Section 2
Establishing Tours of Duty
GENERAL PROVISIONS
* * * * *

Notice of Working Hours

a. All tours of duty will be established in advance and published by memorandum or other administrative order of the installation. Although work schedules generally will be established on an installation-wide basis, they must nevertheless be recognized as personal to each employee for the purpose of accruing leave benefits in accordance with the Annual and Sick Leave Act of 1951, reporting attendance and absence from duty, as well as establishing the time unit on which his pay is computed. Notices will be posted in conspicuous places, readily accessible to all employees affected by the notice. Schedules for individual employees, or an excepted group *113 of employees, also will be in writing, witli appropriate distribution.

Changes in WorMng Hours

b. Changes in established work schedules will be made in writing, with as much advance notice to employees as possible. Arbitrary changes in starting time and frequent fluctuations from day to night shifts will, be avoided. Where changes from day shifts to night shifts are necessary, it is generally desirable for employees to remain on one shift a minimum period of at least 2 weeks (a period corresponding to the established pay period). A period of at least 4 weeks (two pay periods) is even more desirable.
* * * * *
OVERTIME HOURS
2-3. a. Overtime services of civilian employees, except as necessitated because of disaster or emergency, may be utilized only to meet essential deadlines or to maintain absolutely essential operations. When so utilized it will be restricted to the absolute minimum required for the accomplishment of the project. Hours of work may be increased either as an extension of the regularly scheduled workweek or on an intermittent overtime basis. Commanding officers will install appropriate controls to assure that all authorized overtime conforms to the above policy.
b. Commanding officers should delegate authority to specific officials by position to order and approve performance of overtime work (see par. 3, DA Orders B, quoted in par. 1-3). When overtime work is duly ordered or approved, and performed, employees may not be denied pay therefor. Conversely, employees cannot obligate the Government for overtime work performed on their own initiative.
c. When tours of duty are established to include regularly scheduled overtime, the following principles should be observed:
(1) The use of regularly scheduled overtime periods will be kept to an absolute minimum, and limited to those activities of an installation where the need therefor is established. In all cases, actual operating needs will be the basis for such schedules.
(2) Except under extraordinary circumstances, regularly scheduled overtime hours will not be directed in excess of 48 hours each week.
*114 (3) Before approving an overtime schedule, every effort should be made to eliminate the necessity for the overtime work through assignment of personnel from activities in which the workload has decreased, through recruitment of additional personnel within prescribed personnel authorizations, or through rescheduling the hours of work.
(4) Regularly scheduled overtime tours should be approved for as short a period as possible, and renewed only if absolutely necessary.
(5) Nonwork days should be staggered when it is necessary to provide six- or seven-day coverage for a particular activity. See paragraph 2-2a for instructions regarding regular days off.
(6) The overtime hours should be scheduled on Saturday, if possible.
¡$t * * ❖ *
Section 3
Hours of Work Involving Stand-by Time
# sfc * * $
DETERMINING STATUS OF STAND-EX TIME
3-2. The determination of whether a given period is stand-by time for which compensation is allowed depends upon the conditions and circumstances of the employment. The mere fact that an employee is available to perform service or is available to receive a call is not sufficient. His whereabouts and his freedom of choice to follow his normal living habits, and to engage in personal activities at places of his own choosing, must be limited by the conditions of his employment (rather than geographical location), for the benefit of the Government.

Restriction Became of Geographical Location

a. An employee’s acceptance of the duties to be performed in a given position carries with it a responsibility on his p,art to limit his off-duty activities to the extent that he is available for duty on his next workday. There are certain employments, however, which require a narrower limitation of an employee’s off-duty time because of the geographical location of the work site and/or the nature of the duties to be performed. This is particularly true of caretakers, locktenders, and similar personnel who live on the premises, and other workers such *115 as surveyors and members of field groups whose duties are at isolated locations, and who may live continuously in camps and have, in effect, combined living and duty stations. Such limitations are of natural origin, .are not the result of employment conditions within the control of the Army Establishment, and are not deliberately required by the Army Establishment for the benefit of the Government. In such cases, an employee’s off-duty time is not compensable stand-by time, even though he may be required to remain at his work site, and is available to perform service whenever the need arises. Actual service required during any normal off-duty period would be considered compensable time.

Restriction of Employee's Freedom

b. No hard and fast rule can be stated which will cover all cases wherein an employee’s freedom is restricted to the extent that stand-by time may be considered duty time for which compensation is payable. The following examples illustrate the extent to which the Army Establishment recognizes stand-by time as duty time for pay purposes:
(1) A firefighter in the Army Establishment is employed on a schedule of 24 hours on duty and 24 hours off duty. During his off-duty period he is not required to remain at his post of duty, but is free to engage in personal activities of his own choosing. During his on-duty period, he is required to remain at the fire station and respond immediately to all calls, day or night. Eating and sleeping facilities are provided at the station. Although he is not required to perform actual service during the entire 24-hour on-duty period (as much as 8 hours being allowed for sleeping and eating), his normal living habits are nevertheless restricted by administrative regulation of the Army Establishment for the benefit of the Government, and compensation is allowed for the stand-by time. The on-duty periods of such a schedule represent regularly scheduled stand-by time, and is the normal “on-call” tour of duty in the Army Establishment (par. 3-3).
(2) A civilian doctor, employed in an Army hospital on a regular tour of duty of five 8-hour days, Monday through Friday, is required to stand by for emergency work a certain number of nights each month. This stand-by time is spent in the hospital where he is required to remain on-call at all times. Eating and sleeping facilities are provided at the hospital. Since the doctor’s *116 freedom is narrowly limited by administrative regular tion of the hospital, the stand-by time spent “at or within the confines of his post of duty” is considered duty time for which compensation is allowed. Such service is referred to as “on-call overtime,” as provided in paragraph 3-4.
(3) A civilian doctor is employed on a regular tour of duty of five 8-hour days, Monday through Friday. He is required to stand by for emergencies, on a rotating schedule, one night during a 3-week cycle. He resides on the installation in quarters provided by the Government. During the stand-by time, however, he is not required to remain at his post of duty (as distinguished from his place of residence). The stand-by time may be spent as the doctor chooses, except that he is required to leave word at his post of duty where he can be reached at any time. Since his freedom is not restricted to any great extent, the stand-by time is not service “at or within the confines of his post of duty” and, as such, is not com-pensable duty time. Service performed in response to an emergency call, however, is compensable as prescribed inCPKPll.
ON-CALL TOURS OE DUTY
3-3. a. Work schedules in which the basic tours of duty are comprised solely of regularly scheduled standby time are identified as on-call tours of duty. Employees assigned such schedules are classified as on-call employees. (Employees who are assigned regular tours of duty of 40 basic hours each week and who perform on-call overtime, as provided in paragraph 3^4, are not identified with this group.) The following factors must be present in all cases for the establishment of an on-cali tour of duty:
(1) The character of the duties to be performed must be such that the need therefor is unpredictable, such as fires or emergency calls for medical services.
(2) The entire time must be spent at the employee’s post of duty (as contrasted to his place of residence).
(3) Eating and sleeping facilities must be provided at the post of duty.
(4) The established tour of duty must prescribe a definite number of stand-by hours on duty followed by a definite number of hours off duty. A minimum of 60 stand-by hours (the basic tour of duty) during each administrative workweek is required. Where a regularly scheduled overtime period is required, the tour of duty may not exceed a maximum of 72 hours, con *117 sisting of 60 basic hours and 12 overtime hours. For pay computation purposes, each hour of the on-call tour of duty is applied on a two-thirds basis; that is, compensation is computed at two-thirds of the appropriate rate (s) of pay. The time allowed for sleeping and eating (normally, 8 hours during each 24-hour period) need not be identified for pay purposes. See CPU Pll.4.

Restriction on Use

c. On-call tours of duty may be established for the following classes of personnel who are designated “on-call” employees for pay computation and leave accrual purposes (CPE, LI and CPE Pll):
(1) Firefighters. — This term may include fire chiefs, assistant fire chiefs, fire prevention inspectors, and other similar fire protection personnel when their services can be more effectively utilized on an on-call basis. See SE 420-510-1.
(2) Guards and other maintenance-protective, custodial personnel, etc. — Guards and other maintenance-protective, custodial personnel, and particularly those employed at stand-by installations, when it is desired that all services consist of regularly scheduled stand-by time subject to prior approvel in accordance with paragraph 3-5. _
_ (3) Civilian doctors, nurses, and other personnel employed in hospitals and dispensaries. — Civilian doctors, nurses, and other personnel employed in hospitals and dispensaries, when all services of such personnel consist of regularly scheduled stand-by time, and can be more effectively utilized on this basis. Prior approval is required in accordance with paragraph 3-5.
(4) Other employees. — Any other'employee, or group of employees, designated on-call, subject to the approval requirements of paragraph 3-5.
ON-CALL OVERTIME

Reguirements

3-4. a. On-call overtime, as used herein, represents additional hours that regular full time employees (excluding on-call employees as defined in par. 3-3) may be required to spend at a work site, outside their regularly scheduled tour of duty, as illustrated in paragraph 3-2b(2). In order to consider such additional hours as compensable overtime hours, the following requirements must be observed:
*118 (1) The stand-by service will be performed in rotating shift systems by employees working regularly scheduled tours of duty of 40 basic hours during each administrative workweek.
(2) The stand-by time will be limited to situations requiring a minimum of 16 consecutive hours of coverage, in addition to the employee’s regular daily tour. The stand-by time must be spent at the employee’s post of duty (as contrasted to his place of residence).
(3) Eating and sleeping facilities must be provided at the post of duty.
(4) For pay computation purposes, each hour of the occasional stand-by time will be applied on a one-half basis; that is, compensation will be computed at one -half of the employee’s overtime rate of pay for his regular position. The time allowed for sleeping and eating (normally 8 hours during each on-call period) need not be identified for pay purposes. Such stand-by hours do not represent a part of the employee’s basic tour of duty for leave purposes.

Restriction on Use

b. The use of occasional on-call overtime, as provided above, is restricted to doctors and nurses, unless prior approval for other classes is obtained in accordance with paragraph 3-5. Employees assigned basic on-call tours of duty, as provided in paragraph 3-3, are not eligible for compensation for on-call overtime.
APPROVAL REQUIREMENTS

General

3-5. a. It is the desire of the Department of the Army that work schedules involving stand-by time, other than those provided for above, be resolved on a normal basis wherever possible. Where up to 24-hour coverage is required, the possibility of establishing regular tours of duty on a rotating shift basis should be considered with personnel assigned to the shifts in accordance with the service required. The possibility of providing adequate coverage by requesting employees to advise of their location for receiving possible emergency calls (par. 3-2b(3)) also should be considered. Installation commanders may establish on-call tours for firefighters, and tours including on-call overtime for doctors and nurses in accordance with paragraphs 3-3 and 3-4. Prior approval of the Civilian Personnel Division, Office, Secre *119 tary of the Army, will be obtained before on-call status is established as compensable time for any other class of employees.
38. (a) In December 1952, subparagraph “a” of paragraph 1-4 of section 1 of the Civilian Personnel Eegulations of the Department of the Army relating to the subject of hours of work was revised to read as follows:
a. An administrative workweek is a period of seven consecutive calendar days, used as a unit in computing pay. Generally, the administrative workweek is identical to the calendar week, beginning at 0001 hours on Sunday and ending at 2400 hours the following Saturday. In case of on-call employees (section 3), the administrative workweek normally will be established to begin and end on the hour of a day when shifts change. The administrative workweek consists of the regularly scheduled tour of duty, as defined below, and the regular day(s) off.
(b) In December 1952, subparagraph “c” of paragraph 1-4 of section 1 of the Civilian Personnel Eegulations of the Department of the Army relating to the subject of hours of work was revised to read as follows:
c. The basic tour of duty is the 40-hour workweek, established pursuant to the statutes cited in paragraph 1-2. Service during the basic tour of duty is compensated for at straight time rates as prescribed in CPE Pll. Generally, the basic tour of duty will consist of five 8-hour days, Monday through Friday of each administrative workweek. For on-call employees, the basic tour of duty is a 60-hour workweek, consisting of five 12-hour periods (;paragraph e below).
(c) In December 1952, subdivision (4) of subparagraph “a” of paragraph 3-3 of section 3 of the Civilian Personnel Eegulations of the Department of the Army relating to the subject of hours of work was revised to read as follows:
(4) The established tour of duty must prescribe a definite number of stand-by hours on duty, followed by a definite number of hours off duty. A minimum of 60 stand-by hours (the basic tour of duty) during each administrative workweek is required, and normally will consist of two 21¡.-hoivr periods and one 12-hour period. Where a regularly scheduled overtime period is required, the on-call tour of duty may not exceed a maximum of *120 72 hours, consisting of 60 basic hours (five 12-hour periods) and 12 overtime hours. For pay purposes, each hour of the on-call tour of duty is computed at two-thirds of the appropriate rate (s) of pay. The time allowed for sleeping a¡nd eating (normally 8 hours during each 24-hour period), need not be identified for pay purposes. See CPU Pll.
39. The Civilian Personnel Regulations of the Department of the Army relating to hours of work were revised on November 3, 1954, a's of the first day of the first pay period beginning after October 31,1954, to read in part as follows:
Section 1
General Provisions
SCOPE AND COVERAGE
b. These regulations provide the requirements for fixing tours of duty for all employees of the Army Establishment, wherever located, regardless of their tenure of employment and legal basis for computing their pay. * * *
LEGAL BASIS

Classification Act Employees

1-2. a. Section 604(a), Federal Employees Pay Act of 1945 (5 U.S.C. 944, as amended, see chapter Zl, Federal Personnel Manual) contains the procedures, as indicated in (1) through (6) below, with respect to tours of duty for all full-time employees subject to the compensation schedules of the Classification Act of 1949 (5 U.S.C. 1071, as amended, see chapter Zl, Federal Personnel Manual). While these provisions apply specifically to employees holding Classification Act positions, they are considered to be evidence of a Congressional policy that should apply to all employees. Therefore, these same principles will be applied to the establishment of tours of duty for Wage Board employees. Exception to the following principles will be made only in those cases where commanding officers of installations determine that their application would seriously handicap the performance of a function or where substantially increased costs would result.
(1) There will be established a basic workweek of 40 hours.
*121 (2) Assignments to tours of duty will be scheduled in advance and the assignments to a tour shall cover periods of not less than one week.
(3) The basic 40-hour workweek will be scheduled on 5 days, preferably Monday through Friday, and the two days outside the basic workweek will be consecutive.
(4) The working hours for each day in the basic workweek will be the same and the basic nonovertime workday will not exceed 8 hours.
(5) The basic workweek will not be altered because of the occurrence of a holiday.
(6) Daily tours of duty will not be broken by off duty periods of more than one hour.

Wage Board Employees

b. (1) Section 23, act 28 March 1934 (48 Stat. 522; 5 U.S.C. 673c) fixes the basic workweek at not more than 40 hours for employees in the several trades and occupations whose compensation is determined by wage boards and other wage fixing authorities (within the Army Establishment, the Army-Air Force Wage Board. See CPE P2).
(2) Section 1, act 1 August 1892 (40 U.S.C. 321), as amended (generally referred to as the Eight-Hour Law), establishes an 8-hour day for all employees classified as laborers and mechanics employed on a public work of the United States. Executive Order 10251, however, suspends application of the statute for the duration of the emergency for such personnel employed by the Department of Defense on any work essential to national defense (sec. 4).
# ‡ # # #
DEFINITIONS
*

Tour of Duty

b. Tour of duty refers to the hours of the day, and the days within an administrative workweek, fixed in advance, during which the employee is required to perform service on a regular, repetitive basis. As used in these regulations, an employee’s tour of duty consists of his basic tour of duty and any overtime work that is scheduled to be performed on a regular, repetitive basis.

Basic Tour of Duty

c. The basic tour of duty is the 40-hour workweek, established pursuant to the statutes cited in paragraph *122 1-2. Normally, the basic tour of duty will consist of five 8-hour days, Monday through Friday of each administrative workweek.

Rotating Tours of Duty

d. Rotating tours of duty are those regularly scheduled tours which periodically require service on a different shift.

Standby Tour of Duty

e. A basic tour of duty involving regularly scheduled standby time is defined as a standby tour of duty; that is, where the employee is not required to devote all of his time in actually performing services, but nevertheless is required to remain at or within the confines of his post of duty to perform service when called or when the need arises. (Sec. 8.)

Part Time Tow of Duty

f. A part time tour of duty is a scheduled tour of less than 40 hours which requires service on a regular, repetitive basis on one or more days of each administrative workweek.

Regularly Scheduled Overtime

g. Regularly scheduled overtime refers to the periods in the administrative workweek, in excess of the basic tour of duty, during which the employee is required to perform service on a regular, repetitive basis.

Irregular or Occasional Overtime

h. Irregular or occasional overtime is authorized service performed at infrequent intervals which is [in] excess of the hours established for the regularly scheduled tour of duty as defined above.
$ # # #
Section 2
Establishing Tours of Duty
GENERAL PROVISIONS
2-1. This section contains instructions regarding those matters which must be considered in establishing tours of duty. Additional instructions regarding standby tours and tours for laborers and mechanics are contained in sections 3 and 4, respectively. Tours of duty are the *123 means by which management schedules personal services to assure necessary and efficient production. They identify the hours of the day and the days of the week during which employees may be held responsible for being on duty and for which compensation normally is paid. Additionally, tours of duty provide a basis for the accrual and grant of leave (see CPE LI). As a general rule, tours of duty will be established on an installation-wide basis. Commanding officers, as part of their management function, have the responsibility of planning and establishing tours of duty required for performance of the functions of the installation. Where intermittent (when actually employed) personnel are being utilized on a regularly scheduled basis, or whenever it is contemplated that regularly scheduled service will be required on at least 1 day of each administrative workweek, appropriate tours of duty will be established. Although tours of duty are established at the discretion of commanding officers, there must be assurance that they are proper in terms of age, health, sex, and prescribed statutory requirements (par. 1-2). Where it is necessary to establish tours on a basis other than the normal 8-hour day Monday through Friday, the necessity for the tour should be explained to the employees affected, and if possible the employees’ views should be obtained as to the exact tours to be established.

Advance Notice

a. All tours of duty (including irregular or unusual tours) will be established at least 1 week in advance by the commanding officer or his designated representative and will be announced in writing. The announcement will identify the calendar days and the hours of each day comprising each tour. Copies of the announcement will be posted in conspicuous places, readily accessible to all affected employees. In the case of irregular or unusual tours for individual employees or special groups of employees, written notification will be given to affected employee (s), supervisor (s), time and attendance clerk (s), and the payroll office.

Changes in Tours

b. Changes in established work schedules will be made in writing, with as much advance notice to employees as possible. Arbitrary changes in starting time and frequent fluctuations from day to night shifts will be avoided. Where changes from day shifts to night shifts *124 are necessary, it is generally desirable for employees to remain on one shift a minimum period of at least 2 weeks (a period corresponding to the established pay period). A period of at least 4 weeks (two pay periods) is even more desirable. Tours of duty will not be changed for the purpose of avoiding, or creating the necessity for payment of overtime, night differential, or holiday pay.
* * * # *
OVERTIME HOURS
2-3. a. Overtime services of civilian employees, except as necessitated because of disaster or emergency, may be utilized only to meet essential deadlines or to maintain vital operations. When so utilized it will be restricted to the absolute minimum required for the accomplishment of the project. Hours of work may be increased either as an extension of the established basic tour of duty or on an intermittent overtime basis. Commanding officers will install appropriate controls to assure that all authorized overtime conforms to the above policy.
b. Commanding officers should delegate authority to specific officials by position to order and approve performance of overtime work (see par. 3, DA Orders B, quoted in par. 1-3). The signature of such official on the time and attendance report will satisfy the requirement that overtime be duly ordered or approved. When overtime work is duly ordered or approved, and performed, employees may not be denied pay therefor, unless compensatory time off is required or taken by per annum employees in accordance with CPU Ll.7-4.
Conversely, employees cannot obligate the Government for overtime work performed on their own initiative.
c. "When tours of duty are established to include regularly scheduled overtime, the following principles will be observed:
(1) The use of regularly scheduled overtime periods will be kept to an absolute minimum, and limited to those activities of an installation where the need therefor is established. In all cases, actual operating needs will be the basis for such schedules.
(2) Except under extraordinary circumstances, regularly scheduled overtime hours will not be directed in excess of 48 hours in an administrative workweek.
(3) Before approving an overtime schedule, every effort should be made to eliminate the necessity for the *125 overtime work through assignment of personnel from activities in which the workload has decreased, through recruitment of additional personnel within prescribed personnel authorizations, or through rescheduling basic tours of duty. .
(4) Begularly scheduled overtime tours should be approved for as short a period as possible, and renewed only if absolutely necessary.
(5) The overtime hours should be scheduled on Saturday, if possible.
*****
Section 3
Tours of Duty Involving Standby Time
GENERAL PROVISIONS
3-1. There are certain .activities in the Army Establishment which require the presence of employees for longer than 40 hours per week, although actual work is not required for the entire period. These situations are covered either by the establishment of a standby tour or by requiring standby time in addition to a basic 40 hour workweek. Standby tours and tours including standby time are distinguished from tours extending beyond 4Ó hours per week because of the necessity for continuous work performance. Tours regularly including continuous work performance beyond 40 hours per week are regularly scheduled overtime tours.

Standby Tours

a. A standby tour is one which does not involve the regular continuous performance of work on a scheduled basis but does require that employees be available to perform work as the need arises. Typical of standby tours are those of firefighters who are on a tour of duty of the 24 hour oil 24 hour off type for a total of 72 hours per week. Standby tours of duty, with a schedule of 60,72, or 84 or more hours of duty per week may be established for employees other than firefighters in accordance with paragraphs 3-3b and 3-7.

Tours Including Standby Time

b. Tours including standby time are those where a basic 40 hour tour of duty is established during which continuous work performance is required^ and? m ad<M *126 tion, the employee is regularly required to remain on standby duty each week for—
(1) A minimum of 14 hours on regular work days- or extending into a non-work day, or
(2) A minimum of 7 hours on one or more regular weekly non-work days.

Touts Inehiding Standby Overtime

c. Occasionally, it may be necessary to establish tours of duty which, while requiring standby duty, do not meet the criteria for either a standby tour, a tour including standby duty, or a regularly scheduled overtime tour. These occasions arise where—
(1) Standby time is not regularly required on a weekly basis but is periodically required on a less frequent basis, and
(2) It is known in advance that the performance of some work will be required during the standby time.
An example of these situations is the tour of duty of a doctor who regularly works 40 hours per week and, in addition, is required every fourth week to remain on duty continuously for 24 hours during which intermittent work is performed (par. 3-6).
DETERMINING STANDBY STATUS
3-2. The determination of whether a given period is standby time for compensation purposes (CPE, P1.6) depends upon the conditions and circumstances of the employment. The mere fact that an employee is available to perform service or is available to receive a call is not in itself sufficient to constitute either a standby tour or a tour including standby time. His whereabouts and his freedom of choice to follow his normal living habits and to engage in personal activities at places of his own choosing, must be limited by the conditions of his employment (rather than geographical location) for the benefit of the Government. Standby time is time during which an employee is available to perform service but is not required to perform actual work and is free to eat, sleep, read, listen to the radio, or engage in other similar pursuits. An employee, is performing actual work, rather than being in a standby status, when his full attention is devoted to his work’, even though the nature of his work does not require constant activity (for example, a guard on duty at his post and a technician continuously observing instruments are engaged, in the actual work of their positions).

*127
Restrictions Because of Geographical Location

a. An employee’s acceptance of the duties to be performed in a given position carries with it a responsibility on his part to limit his off-duty activities to the extent that he is available for duty on his next workday. There are certain employments, however, which require a narrower limitation of an employee’s off-duty time because of the geographical location of the work site and/or the nature of the duties to be performed. This is particuarly true of caretakers and similar personnel who live on the premises, and other workers such as surveyors and members of field groups whose duties are at isolated locations, and who may live continuously in camps and have, in effect, combined living and duty stations. Such limitations are of natural origin, are not the result of employment conditions within the control of the Army Establishment, and are not deliberately required by the Army Establishment for the benefit of the Government. In such cases, an employee’s off-duty time is not compensable standby time, even though he may be required to remain at his work site, and is available to perform service whenever the need arises. Actual service required beyond completion of the basic tour and during any normal off-duty period would be considered overtime.

Restriction of Employee's Freedom

b. To constitute a standby tour of duty or standby time there must be a definite requirement and it must be officially ordered that the employee remain at or within the coniines of his post of duty. This requirement must be associated with the regularly assigned duties of the employee’s position, either as a continuation of his regular duty, or as a requirement to be present to perform work when the necessity arises. The employee may be required to remain at any one of the following locations depending upon the activity in which engaged:
(1) At his regular post of duty.
(2) In quarters provided by the Government, which are not the employee’s living quarters, and which are specifically provided for use of personnel required to be present in readiness to perform actual work when the need arises or when called.
(3) In the employee’s living quarters, when designated as his duty station and when his whereabouts is narrowly limited and his activities are substantially re *128 stricted. This condition exists only during periods when employee is required to remain at his quarters and is required to hold himself in a state of readiness to answer calls for his services. This limitation on an employee’s whereabouts and activities is distinguished from the limitation placed on an employee who is subject to call outside his regular hours of duty but may leave his quarters, provided he arranges for someone else to respond to calls or leaves a telephone number by which he can be reached should his services be required.
CRITERIA EOR STANDBY TOURS OE DUTY
3-3. Work schedules in which the basic tours of duty are comprised primarily of regularly scheduled standby time (pars. 3-la and 3-2) are identified as standby tours of duty. Employees assigned such schedules are identified as standby employees. (Employees who are assigned regular tours of duty of 40 basic hours each week and who in addition perform standby duty (par. 3-lb) or standby overtime (par. 3-lc) are not identified with this group.)

Requirements To Be Met

a. The following factors must be present in all cases for the establishment of a standby tour of duty :
(1) The character of the duties to be performed must be such that the need therefor is unpredictable, such as fires.
(2) The entire time must be spent at the employee’s post of duty (as contrasted to his place of residence).
(3) Eating and sleeping facilities must be provided at the post of duty.
(4) A substantial part of the tour of duty, at least 25 percent, consists of remaining in a standby status rather than performing work.

Restrictions on Use

b. Standby tours of duty are established by these regulations for firefighters (par. 3-4). Commanding officers may establish standby tours of duty for firefighter guards where the situation meets the requirements set forth in this section. Where it is considered desirable to establish standby tours of duty for any other group of employees, prior approval must be obtained in accordance with paragraph 3-7.
* * * * *
*129 CRITERIA FOR TOURS INCLUDING STANDBY TIME
3-5. Tours of duty which include a requirement for standby time (par. 3-lb) may be established only with prior approval (par. 3-7).
STANDBY OVERTIME

Criteria

3-6. a. Standby overtime (par. 3-lc) represents additional hours that regular full time employees, excluding those having standby tours, and those whose tours include standby time, may be required to spend at the work site outside their regularly scheduled tour of duty. In order to consider these hours as compensable overtime hours the following requirements must be observed:
(1) The standby time must be required on a regular basis which is less frequent than weekly.
(2) There must be a requirement known in advance for the performance of intermittent work during the standby period.
(3) Aside from the requirement for intermittent work the period must otherwise meet the criteria for standby status.
(4) The standby time will be limited to situations requiring a minimum of 16 consecutive hours of coverage, in addition to the employee’s regular daily tour. The standby time must be spent at the employee’s post of duty (as contrasted to his place of residence).
(5) Eating and sleeping facilities must be provided at the post of duty.
(6) For pay computation purposes, each hour of the occasional standby time will be applied on a one-half basis; that is, compensation will be computed at one-half of the employee’s overtime rate of pay for his regular position. The time allowed for sleeping and eating (normally 8 hours during each standby period) need not be identified for pay purposes. Such standby hours do not represent a part of the employee’s basic tour of duty for leave purposes.

Restriction on TJse

b. The use of occasional standby overtime, as provided above, is restricted to doctors and nurses, unless prior approval for other classes is obtained in accordance with paragraph 3-7.
*130 APPROVAL REQUIREMENTS

General

3-7. a. It is the desire of the Department of the Army that standby tours or work schedules involving standby time, other than those provided for above, be resolved on a normal basis wherever possible. Where up to 24-hour coverage is required, the possibility of establishing regular tours, of duty on a rotating shift basis should be considered with personnel assigned to the shifts in accordance with the service required. The possibility of providing adequate coverage by requesting employees to advise of their location for receiving possible emergency calls also should be considered.

Data Required

b. The following indicates the approval requirements for establishing standby tours of duty and other standby status for categories of employees not covered in this section. Each request for prior approval will be submitted to the office of civilian personnel, Office, Secretary of the Army, Washington 25, D.C. * * *
40. On April 17, 1957, paragraph 3-3 of section 3 of the Civilian Personnel Regulations of the Department of the Army relating to hours of work was revised to read in part as follows:
CRITERIA EOR STANDBY TOURS 03? DUTY
3-3. Work schedules in which the basic tours of duty are comprised primarily of regularly scheduled standby time (pars. 3-la and 3-2) are identified as standby tours of duty. Employees assigned such schedules are identified as standby employees. (Employees who are assigned regular tours of duty of 40 basic hours each week and who m addition perform standby duty (par. 3-lb) or standby overtime (par. 3-lc) are not identified with this group.)

Requirements To Be Met

a. The following factors must be present in all cases for the establishment of a standby tour of duty:
(1) The character of the duties to be performed must be such that the need therefor is unpredictable, such as fires.
*131 (2) The entire time must be spent at the employee’s post of duty (as contrasted to his place of residence).
(3) Eating and sleeping facilities must be provided at the post of duty.
(4) A substantial part of the tour of duty, normally an amount approximating the hours of actual work, consists of remaining in a standby status rather than performing work. In no instance may the standby time be less than 25 percent of the tour.
41. During the period of time involved in this litigation, the Civilian Personnel Regulations of the Department of the Army on the subject of computation of pay provided in part as follows:
Section 3
Overtime Pay
GENERAL PROVISIONS ANB COVERAGE
3-1. Overtime rates are payable for 'all authorized hours of work in excess of 40 hours in a unit week to all Classification Act and Wage Board employees, except experts and consultants (see CPR P11.5). Modifications of this rule for employees subject to the 8-hour law and certain other employees are stated in paragraphs 3-3 and_3-4. However, as stated in CPR H2.5-6, when anyone in authority requires work in excess of 40 hours in a unit week, payment therefor must be made even though all overtime control requirements were not met through inadvertence or willful action. In all cases, the number of hours for which overtime rates are payable are computed for each unit week separately. In no case may hours worked in one unit week be combined with hours worked in another when determining whether overtime rates are payable. Special rules on on-call employees and experts and consultants are given in CPR Pll-4 and 5.
OVERTIME RATES

Wage Board Employees

3-2. a. For all Wage Board employees, the overtime rate is 1% times the basic rate of compensation (see par. 2-3). For certain trades and occupations, specific overtime rates other than time and one-half may be fixed by the Army-Air Force Wage Board to meet the standards and conditions in the industry concerned.

*132
Glassification Act Employees

b. Section 25.143, appendix A, these regulations, gives the rate of overtime compensation for Classification Act employees. The table given in paragraph (b) of that section is derived from a similar table prescribed by the Federal Employees Pay Act of 1945. For basic salary rates above $2,980 per annum, the overtime rate is somewhat less than time and one-half, and for salary rates above approximately $4,060 per annum, the overtime rate actually is less than the straight-time rate. The hourly overtime rates computed according to the note in paragraph (b) of the cited section are to be carried to seven decimal places. The formula to be used is as follows, with X equalling the salary rate for which an overtime rate is desired:
894— .076782X (X-2980) ,. ,. _ , , -^= the overtime hourly salary rate 416
The hourly overtime rate for salaries of $6,440 or more per annum is $1.5104182. (The above formula is of use at the present time mainly for computing overtime rates in oversea areas where the foreign service differential is applicable.)
HOURS EOR WHICH OVERTIME RATES ARE EATABLE

General

3-3. a. In computing overtime compensation, the time worked will be considered in quarter-hour multiplies [sic] (CPU H2.2-23). Any work less than a 15-minute multiple will not be aggregated from day to day for pay purposes, but will be dropped on a daily basis For overtime fay purposes, there is at present no difference between regularly scheduled overtime and irregular or occasional overtime, although there is a difference when considering court leave (CPE L1.8), and pay when traveling (CPE P11.6), and there may be a difference for reporting purposes.

White Sands Regulations

42. On July 29, 1949, the commanding general at White Sands issued the following order regarding working hours at the installation:
1. The working hours at this activity are from 0745 hours (7:45 A.MT) until 1615 hours (4:15 P.M.) Monday through Friday of each week.
*133 2. There will be a period of thirty (30) minutes for lunch for all military personnel and civilian employees, staggered as follows:
1130-1200 hours — Enlisted Men.
1130-1230 hours — Officers (any 30 minute period within the hour).
1145-1215 hours — Civilian employees.
1045-1100 hours — Early Mess (admittance by written pass only).
43. On December 14, 1951, the commanding general at White Sands issued a directive concerning the payment of overtime to Civil Service personnel. This directive provided in part as follows:
3. Overtime rates are payable for all authorized hours of work in excess of forty hours in a unit week to all graded and wage board employees (except experts and consultants). When anyone in authority requires work in excess of forty hours in a unit week, payment, therefore [sic], must be made even though all overtime control requirements were not met through inadvertence.
44. On March 3, 1954, the commanding general at White Sands issued instructions on the subject of “Standard Daily Working Schedule.” These instructions provided in part as follows:
1. Basic WorkWeek.
a. The basic work week for regular civilian employees of this activity consists of 40 hours. The normal tour of duty is Monday through Friday, 8 hours each day from 0745 to 1615 hours, with 30 minutes for lunch.
b. The basic work week for guards is 4214 hours and the basic work week for firefighters is 60 horn’s.
c. Different tours of duty may be established for employees in utilities and service activities. Such irregular tours must be established in writing and the original signed copy on file in the Payroll Office.
45. On June 1, 1955, the commanding general at White Sands issued a set of Civilian Personnel Regulations, which superseded the previous instructions covering the same subject matter. These regulations contained the following provisions relative to the basic work week at the installation:
*134 BASIC WORK WEEK
The basic work week for regular civilian employees of this activity consists of 40 hours. The normal tour of duty is Monday through Friday, 8 hours each day from 0745 to 1615 hours, with 30 minutes for lunch.
The basic work week for guards is 421^ hours and the basic work week for firefighters is 72 hours.
Different tours of duty may be established for employees in utilities and service activities. Such irregular tours must be established in writing and the original signed copy on file in the Payroll Office.
46. Under the date of March 20, 1957, a number of the civilian bus drivers at White Sands, including most of the plaintiffs, addressed the following letter to the Civilian Personnel Officer at White Sands on the subject of the bus drivers’ tours of duty:
1. We understand it to be the policy of the Secretary of Defense (Manual for Operating Officials) that “employees shall be encouraged to express themselves concerning improvement of work methods and working conditions” and in that respect the matter of the interpretation and establishing of the tour of duty of bus drivers at White Sands Proving Ground has been discussed and taken up orally at a supervisory leval [sic] and no satisfactory solution having been obtained, it becomes necessary to submit the matter in writing to you for determination, so that we may then guide ourselves accordingly as to further action or appeal.
2. The tour of duty involving bus drivers has been counted as 8 hours, but in actual fact and practice it involves 12 hours — from 6:00 a.m. to 6:00 p.m. For instance, if a tour is from 6:00 to 8:00 in the morning and then from 12:00 to 6:00 in the afternoon, it overlooks the fact that the intervening 4 hours, 8:00-12:00 have had to be spent on the post and in the past it is our understanding that even annual leave for the intervening period was deducted from the employee if he were to leave the post and sometimes the gates are locked; further, during the intervening period it has often become and is necessary to have the bus checked for servicing or fixing of flats, or starting at least an hour before the scheduled driving period to have the bus picked up at a distant location. The statement of OPE, H 2 [sic], Section l-2a that basic daily tour of duty will not exceed 8 hours, which may be broken by off duty periods of more *135 than one honr during which “employees will not be in a stand-by status nor will they be restricted from engaging in personal activities and may spend their off-duty hours as they see fit” overlooks the fact that realistically speaking the driver must be in a stand-by status with the distance from the base to Las Cruces and El Paso, how could it be possible for an employee desiring to go home to do as he saw fit and be back in time to pick up his bus at a point that would require him to start at least an hour or so before the scheduled driving period ? Thus, he is in practicality perforce in a stand-by status or else he could not properly comply with the scheduled driving period. This is only an illustration of the problem involved. For further illustration it may be indicated that a driver having to start at 4 o’clock has often had to start at about 3 o’clock in order to pick it up at the location of the bus. So technically he has to start at least at 3 o’clock. Also sometimes he has to have the bus gassed up or serviced considerably in advance of the scheduled driving period.
3. It is our understanding, therefore, that the established tour should be considered as 12 hours and that compensation on that basis should be afforded, or else that a tour of duty be established with no split shifts. Further, from informal discussion it has been indicated that the operating practice involving 12 hours without compensation for the extra 4 hours is contrary to Civil Service regulations or governmental policy. It is also our understanding that personnel who operate on any comparable basis at the base are paid overtime, for instance we understand that fireman [sic] on stand-by status get paid for intervening time and likewise the security guards.
4. From the foregoing it should be apparent that we feel aggrieved by the existing working method and practice and that, if necessary, this may be considered an expression of grievance to invoke the necessary procedure for determination as to whether we should not be entitled for the pay for stand-by status time, or a regular and proper tour of duty be established. A reply in writing is desired so that if satisfactory resolution is not effected, we would like to then appeal directly to the Civil Service Commission.
47. After a meeting had been held to discuss the bus drivers’ letter of March 20, 1957, the following response to that letter was made by the Civilian Personnel Officer at White Sands under the date of March 27,1957:
*136 Receipt is acknowledged of letter dated 20 March 1957, subject, “Tour of Duty Involved by Bus Drivers at White Sands Proving Ground,” which was signed by 44 employees of the Motor Pool.
In order to furnish the information requested in the letter and to explain the regulations and policies relating to the employment situation of bus drivers, a meeting was held at 0900 hours, 27 March 1957, at the Motor Pool Office, attended by Major Miltonberger and members of his staff; Mr. Rafael C. Salas, Mr. George Pointon Jr., Mr. Vick Y. Serna, and Mr. William Bass-ford, representatives of the employees who signed the subj ect letter. Mr. Salas was designated as the person to whom this reply should be addressed.
This is to confirm the matters discussed at the meeting and the explanations of the various regulations pertaining to the problem.
A WSPG Regulation has been written and is in process of publication which authorizes the establishment of regular tours of duty for bus drivers and other factors relating to their hours of work and assignments.. Copies of this regulation when published will be furnished by the Post Transportation Officer to each employee concerned.
This letter refers to CPR H2 and the policy that “Daily tours of duty will not be broken by off duty periods of more than one hour.” The same regulation m paragraph l-2a, provides that exceptions to these principles will be made when Commanding Officers consider it necessary, and in consideration of the situation at this Proving Ground, it has been determined that off duty periods of more than one hour is necessary for bus drivers.
The regulations provide that when an employee’s freedom to engage in personal activities, during his off duty periods, is limited by geographical location, it is not standby time, nor is it compensable. If an employee is required to be “on call” because of his employment, such as a fire fighter who must be ready in case of a fire and his freedom of activity is restricted because of his employment as a fire fighter, then it is standby time. However, in the case of bus drivers, their only restriction is because of geographical location — the fact that we are out in the middle of the desert; and they are not restricted because of their particular job, and, therefore, they are not on standby time.
The schedule of hours of duty for each bus driver is posted on bulletin boards, in advance. This schedule *137 shows the 8-hotir daily tour of duty and the time of starting and ending of each work period. If an employee is required to work extra time either before or after the 8-hour tour of duty, he is entitled to overtime pay. However, he must be directed to perform the extra work in order to receive overtime pay, and if he does work “overtime” on his own initiative without instructions to do so from proper authority, he is not entitled to overtime pay. The time required for an employee to travel from his home or from some other place to his place of duty is not duty time, nor can the employee be paid for this travel time.
The foregoing explanations were given to all persons present at the meeting, and all four representatives of the bus drivers expressed their satisfaction with the explanation, and were asked to advise their co-workers regarding the matters discussed.
Should there be any further questions or dissatisfac-tions regarding this matter, it is suggested that they be presented, through your supervisor, to the Post Transportation Officer, who either will answer your questions or take the matter up with proper authority to get the replies for you. It is requested that this letter be made available to all the bus drivers to read, and it is hoped that it clarifies the situation to the satisfaction of everyone.
48. On March 28,1957, the provisions of the Civilian Personnel Eegulations at White Sands relative to the basic workweek (see finding 45) were expanded by the addition of the following numbered paragraphs:
1. It is considered that application of the principles specified in CPE H2, Section l-2a [see page 48], for the establishment of regular tours of duty for employees, would seriously handicap the effectiveness of the bus transportation facilities of this activity and would result in additional costs due to excessive overtime, if applied to the tour of duty for bus drivers.
2. Exception to the referenced tour of duty is authorized for bus drivers to provide for irregular tours of duty to be established by the Post Transportation Officer, White Sands Proving Ground, New Mexico.
3. The basic daily tour of duty for bus drivers will not exceed eight hours of duty, which may be broken by off duty periods of more than one hour. During the off duty periods, employees will not be in a standby status, nor will they be restricted from engaging in per *138 sonal activities, and may spend their off duty hours as they see fit.
4. All tours of duty for bus drivers will be established at least one week in advance, and will be announced in writing identifying the calendar days, the duty hours of each day, and the names of employees assigned. Copies of the announcement will be furnished each employee and supervisor affected, time and attendance clerks, and the Payroll Office. Copies will also be posted on bulletin boards accessible to affected employees,
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs Jose V. Baca (1), Floyd D. Campbell (4), J. E. Jones (13), Bodolpho Martinez (17), and James M. Simpson (22) are entitled to recover, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Bule 38 (c).
The court further concludes as a matter of law that the plaintiffs Verney B. Bunch (3), Cecil B. Gillespie (9), Werttie L. Haney (12), and Yick Y. Serna (21) are not entitled to recover, and the petition will therefore be dismissed as to them.

 After the establishment of this mixed' Class B and Class A .bus run between White Sands and Las Cruces, any bus driver who was considered by the management to be oft duty In the morning could, If he wished to do so, ride this bus to Las Cruces. Off-duty drivers occasionally went to Las Cruces In this fashion, but it was necessary for such a driver to take annual leave for the time from 12 noon (when his next on-duty period was scheduled to begin) until his actual return to duty at White Sands.

 The plaintiff Serna was formally designated as a “section leader” in February 19:56. His duties in that position were approximately the same as they had formerly been in his role as assistant to the bus master.